**ESSENTIAL COMMUNICATIONS SYSTEMS, INC., Appellant,**

v.

**AMERICAN TELEPHONE & TELEGRAPH COMPANY, Western Electric Company and New Jersey Bell Telephone Company, Appellees.**

No. 78–2521.

United States Court of Appeals,
Third Circuit.

Argued Sept. 7, 1979.

Decided Oct. 30, 1979.

As Amended Nov. 5 and Nov. 13, 1979.

Rehearing and Rehearing In Banc
Denied Nov. 23, 1979.

David Berger (argued), H. Laddie Montague, Jr., Robert Simon Balter, Philadelphia, Pa., for appellant; Berger & Montague, P. C., Philadelphia, Pa., of counsel.

Bernard M. Hartnett, Jr., Donald B. Heeb, Copeland G. Bertsche, Newark, N. J., for appellee, New Jersey Bell Telephone Co.; Harold S. Levy, New York City, Donald K. King, Little Rock, Ark., Frank C. Cheston, of counsel.

Clyde A. Szuch, Frederick L. Whitmer, Pitney, Hardin & Kipp, Morristown, N. J., George L. Saunders, Jr. (argued), C. John Buresh, Sidley & Austin, Chicago, Ill., for appellees American Telephone and Telegraph Company and Western Electric Company.

John H. Shenefield, Asst. Atty. Gen., Barry Grossman, Ron M. Landsman (argued), Attys., Dept. of Justice, Washington, D. C., for United States as amicus curiae.

Before SEITZ, Chief Judge, and GIBBONS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from an order dismissing a private treble damage action and a request for injunctive relief brought under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1976), on the ground that the conduct alleged in the complaint was exempt from antitrust scrutiny because it occurred in an industry and an area subject to regulation by the Federal Communications Commission (FCC). We reverse.

## I. PLEADINGS AND PROCEEDINGS IN THE DISTRICT COURT

The plaintiff is Essential Communications, Inc. (Essential), a corporation engaged in the distribution of telephone station equipment for use at telephone customers' premises. The defendants are American Telephone and Telegraph Company (AT&T), the parent corporation of the Bell System, which comprises the largest telephone communications system in the United States, Western Electric Company (WECo.), AT&T's equipment manufacturing subsidiary, and New Jersey Bell Telephone Company (NJ Bell), one of the AT&T's operating subsidiaries.

On May 17, 1973, Essential filed a complaint charging AT&T, WECo. and NJ Bell with violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), in

**1116**

that they sought to exclude from the market for telephone terminal equipment a device, called a Code-a-Phone, distributed by Essential. The complaint alleges that prior to November 1, 1968, the Bell System maintained a monopoly in the distribution, installation and service of telephone terminal equipment, by virtue of filed tariffs which prohibited customers from attaching to the Bell System station equipment obtained from any source other than Bell. On that date the decision of the Federal Communications Commission (FCC) in *Carterfone*[1] became effective, which according to the complaint, opened up the telephone terminal equipment market to competition and which encouraged Essential to commence distributing, installing, and servicing that equipment. Among the equipment distributed by Essential is the Code-a-Phone, manufactured by Ford Industries, Inc., and supplied by Ford both to Essential and to NJ Bell. This device, when electrically connected to a telephone customer's telephone line automatically answers, transfers, and records incoming calls. Thus Essential and NJ Bell allegedly became competitors in the distribution, installation, and service of Code-a-Phones. However, following the *Carterfone* decision the defendants, in an effort to hinder Essential's competition, filed with the FCC a new tariff which required customers of the Bell Systems to lease from Bell an interface device called a protective connecting arrangement (PCA) before they would be allowed to connect Essential's equipment to the Bell System network. The PCA is alleged to be unnecessary for the protection of the network since the Ford Code-a-Phones distributed by Essential were identical with those distributed by NJ Bell, and no such device is required for the latter. It is also charged that NJ Bell unreasonably delayed in furnishing PCAs to Essential's customers, and

caused service difficulties for those customers by improperly installing and servicing PCAs. The complaint seeks treble damages and unspecified injunctive relief.

On October 3, 1973, by consent of the parties, the district court action was stayed so that the New Jersey Public Utilities Commission might consider the propriety of the PCA tariff. However, in 1974, the FCC asserted exclusive jurisdiction over regulation of the interconnection of customer-provided terminal equipment. When FCC jurisdiction was sustained by the Fourth Circuit Court of Appeals,[2] the New Jersey Public Utilities Commission concluded that it lacked jurisdiction to consider the validity of the PCA tariff, and the district court stay was revoked.

On August 1, 1977, the defendants moved to dismiss the complaint because the activity complained of, being subject to regulation by the FCC, was impliedly exempt from the antitrust laws. Finding in the Federal Communications Act of 1934, 47 U.S.C. §§ 151–609 (1976), an intention to repeal the antitrust laws in areas in which the FCC has exercised its regulatory authority, the district court granted the motion.[3] Thereafter, the court denied as untimely a motion to amend the complaint by adding an allegation that the defendants had committed a fraud upon the FCC by inducing the agency not to suspend the PCA tariff. This appeal followed.

## II. EXEMPTION BY VIRTUE OF FEDERAL LAW

As will be developed herein, this appeal presents no issue of express statutory exemption from the antitrust laws. It involves, rather, the alleged incompatibility between the procompetitive policies of the antitrust laws and the pervasive scheme of regulation for the industry. Because the scheme of regulation varies from statute to statute, and the competitive situation varies

**1.** *In re Use of the Carterfone Device*, 13 F.C.C.2d 420, *reconsideration denied*, 14 F.C.C.2d 571 (1968).

**2.** *In re Telerent Leasing Corp.*, 45 F.C.C.2d 204 (1974) *aff'd sub nom. North Carolina Util. Comm'n. v. FCC*, 537 F.2d 787 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d

631 (1976), *reconsideration denied*, 552 F.2d 1036 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

**3.** The district court's opinion is reported at 446 F.Supp. 1090 (D.N.J.1978).

from industry to industry, there is no general doctrine of antitrust exemption for regulated industries. In some cases, the agency charged with regulation is also explicitly charged with the responsibility for maintaining competition,[4] and in others, as here, there is no such specific statutory delegation. In some industries, the economic desirability of maintaining a natural monopoly in the service being rendered precludes competition and instead substitutes pervasive regulation, while in others there is room for both competition in and regulation of the service.[5] Thus the extent to which antitrust enforcement is consistent with governmental regulation varies from industry to industry. The Sherman Act, embodying as it does a preference for competition, has been since its enactment almost an economic constitution for our complex national economy.[6] A fair approach in the accommodation between the seemingly disparate goals of regulation and competition should be to assume that competition, and thus antitrust law, does operate unless clearly displaced.[7] In determining whether antitrust law has been displaced, the starting point must be the statute under which the industry in question is regulated, in this case the Federal Communications Act of 1934, 47 U.S.C. §§ 151–609 (1976).[8]

A. *The Federal Regulatory Scheme for Telecommunications*

The first venture of the federal government into the regulation of telecommunications was section 7 of the Mann-Elkins Act of 1910, ch. 309, § 7, 36 Stat. 539 (1910), which added telephone and telegraph companies to the list of common carriers subject to the jurisdiction of the Interstate Commerce Commission (ICC).[9] That venture, however, hardly subjected the telecommunications industry to pervasive regulation. Indeed, prior to 1910 no federal regulation of common carriers could be so described. The Interstate Commerce Act of 1887 had required that railroads publish and file with the ICC rates that were just and reasonable, and prohibited certain discriminations. *See* Interstate Commerce Act, ch. 104, §§ 1,

---

4. *See, e. g., Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 368, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (Civil Aeronautics Board *expressly required to consider competition*); *Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (CAB statutory framework specifically refers to competitive power).

5. *Compare United States v. Nat'l Ass'n Sec. Dealers*, 422 U.S. 694, 730, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) (immunity inferred from pervasiveness) *with United States v. R. C. A.*, 358 U.S. 334, 339–46, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959) (approval by FCC of exchange of television stations under license jurisdiction of the Communications Act of 1934 did not foreclose civil action by government under § 4 of Sherman Act) and *Cain v. Air Cargo, Inc.*, 599 F.2d 316 (9th Cir. 1979) (no implied antitrust immunity despite approval of CAB).

6. *See Carnation Co. v. Pacific Westboard Conference*, 383 U.S. 213, 218, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) (antitrust laws fundamental national economic policy).

7. *See United States v. Nat'l Ass'n Sec. Dealers*, 422 U.S. at 719–20, 95 S.Ct. 2427 (implied immunity disfavored and antitrust and regulatory statutes should be reconciled unless clear repugnancy); *Gordon v. New York Stock Exchange*, 422 U.S. 659, 682–83, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (implied repeal is not fa-

vored and not casually allowed); *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963) (preference to "reconcile the operation of both statutory schemes with one another rather than holding one completely ousted."); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

8. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 352, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). *United States v. Borden Co.*, 308 U.S. 188, 198–99, 60 S.Ct. 182, 84 L.Ed. 181 (1939) (looking to legislative history to determine whether statutory schemes repugnant); Intent to imply immunity can be manifested by Congress in different ways, for example, through legislative history, *United States v. Nat'l Ass'n Sec. Dealers*, 422 U.S. at 726, 95 S.Ct. 2427 (looking to Congress' intent), "plain repugnancy between antitrust and regulatory provisions," *United States v. Philadelphia Nat'l Bank*, 374 U.S. at 351, 83 S.Ct. at 1735, or "pervasiveness" of the regulation, *United States v. Nat'l Ass'n Sec. Dealers*, 422 U.S. at 730, 95 S.Ct. 2427. The mere fact of federal regulation is not sufficient to imply immunity. *See Cantor v. Detroit Edison Co.*, 428 U.S. 579, 597 n.36, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).

9. Mann-Elkins Act of 1910, ch. 309, § 7, 36 Stat. 545 (1910).

2, 3, 6, 24 Stat. 379 (1887). Tariffs were generated solely by the carriers, and the role of the ICC was limited essentially to the effectuation of consumer protection and the antidiscrimination policy which were the chief purposes of the legislation. *Id.* In the Elkins Act of 1903, ch. 708, 32 Stat. 847 (1903), and the Hepburn Act of 1906, ch. 3591, 34 Stat. 584 (1906), the ICC was given more extensive tariff authority, including the authority to set aside tariffs and to fix maximum rates.[10] When the Mann-Elkins Act made telecommunications companies common carriers, it imposed upon them the obligation to provide service on request at just and reasonable rates, without unjust discrimination or undue preference.[11] They were made subject, in other words, to the basic consumer protection and antidiscrimination policy of the 1887 Act. The ICC was given jurisdiction to enforce these obligations.[12] But while the Mann-Elkins Act continued and enlarged the ICC tariff jurisdiction over railroads, it did not subject telecommunications companies to the broadened ICC tariff regulatory jurisdiction.[13] Even the existence of broadened ICC tariff regulatory jurisdiction over railroads was not, as of 1912, deemed to exempt railroads from the antitrust laws.[14] A fortiori the less regulated telecommunications companies were not exempt. Finally, when Congress, in 1914, enacted the Clayton Act, it was made expressly applicable to all common carriers.

The Transportation Act of 1920, ch. 91, 41 Stat. 456 (1920), substantially increased the already pervasive regulation of the railroad industry by the ICC. It also made express provision for the authorization of pooling and other anticompetitive provisions which might otherwise have violated the Sherman or Clayton Acts.[15] But the Transportation Act, except for a minor increase in ICC power to enforce the anti-rebate duty,[16] left the regulation of telecommunications common carriers virtually unchanged.[17] Thus under the aegis of the ICC, the competition principle was being curtailed in the railroad context in the interest of the economies thought to flow from the development of such natural monopolies, while the telecommunications companies remained fully subject to the antitrust laws.

Competition among telephone services in the same geographic area was, in the early part of the century, a fact of life. The enactment in 1914 of the Clayton Act's antimerger provisions [18] presented a serious obstacle to the rationalization of a national telephone network. The Willis-Graham Act addressed the problem of competing local telephone exchanges, presenting as it did the specter of waste and inconvenience from the duplication of facilities. *See* Willis-Graham Act of 1921, ch. 20, 42 Stat. 27 (1921) (current version at 47 U.S.C. § 221 (1976)). That statute authorized the ICC to approve the consolidation of properties of telephone companies into single companies if such consolidation is "of advantage to the persons to whom service is to be rendered and in the public interest." *Id.* (current version at 47 U.S.C. § 221(a)). The

---

10. *See* Hepburn Act of 1906, ch. 3591, § 4, 34 Stat. 584 (1906).

11. *See* Mann-Elkins Act §§ 7, 12, ch. 309, 36 Stat. 539 (1910).

12. *See* Interstate Commerce Act, ch. 104, §§ 8, 9, 12, 13, 24 Stat. 379 (1887); Mann-Elkins Act of 1910, ch. 309, §§ 12, 13, 36 Stat. 539 (1910).

13. *See Western Union Tel. Co. v. Esteve Bros.*, 256 U.S. 566, 573, 41 S.Ct. 584, 65 L.Ed. 1094 (1921) (all common carriers subject to antidiscrimination principle, but differences exist between railroads and telecommunications carriers as to relationship with ICC).

14. *See, e. g., United States v. Terminal R. R. Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897).

15. *See* Transportation Act of 1920, ch. 91, § 407, 41 Stat. 456 (1920).

16. *See id.*, § 404, 41 Stat. 456.

17. *See* H.R.Rep.No.456, 66th Cong., 1st Sess. 11 (1919); *see also* H.R.Conf.Rep.No.650, 66th Cong., 2d Sess. 64–65 (1920).

18. Clayton Act, ch. 323, § 11, 38 Stat. 730 (1914) (current version at 15 U.S.C. § 21 (1976)).

statute granted express immunity from the antitrust laws for such consolidations. *Id.*

Thus, as of 1921, the telecommunications industry was by federal law recognized as a common carrier, subject to the consumer protection and antidiscrimination features of the Interstate Commerce Act, and exempt from antitrust liability for consolidations of local competing service systems. It was, however, otherwise subject to the antitrust laws. Indeed, a government antitrust suit had in 1914 produced a consent decree against AT&T.[19] Aside from the ICC jurisdiction to enforce AT&T's obligation to provide service on request at just and reasonable rates without undue discrimination or undue preference, AT&T was free to determine its rates, its return on investment, and its service obligation. Federal law did not even impose an obligation to interconnect with other communications common carriers. AT&T's local subsidiaries were, however, subject to regulation in other respects at the state level. This describes the state of telecommunications law when Congress passed the Federal Communications Act of 1934, 47 U.S.C. §§ 151–609 (1976).

Before we turn to the particulars of that Act, it is worthwhile noting the evolution of public utility regulation in the fifty years following the enactment in 1877 of the Interstate Commerce Act. The earliest, and perhaps still most common form of regulation, is the imposition on public utilities of the obligation to offer their services to all customers on a more or less equal basis. Ratemaking and the definition of service obligations were, absent discrimination, left in the hands of the carriers, subject to the forces of the marketplace, except for extreme abuses. The early ICC legislation took this form. Later, however, as natural monopolies came to be recognized, utility

regulation took on a second aspect. In the absence of competition, government regulation both of service obligation and of rates was added to the earlier regulation of what, for want of a better term, can be called the antidiscrimination obligation. By the time of the passage of the Transportation Act of 1920, ICC regulation of railroads had evolved to such a stage that it included both aspects: enforcement of the antidiscrimination obligation, and detailed regulation of service obligations and rates. Telecommunications regulation, on the other hand, at least on the federal level, had not, prior to 1934, progressed beyond the first stage.

In 1934 Congress created the Federal Communications Commission (FCC), vesting it with all of the telecommunications jurisdiction theretofore vested in the ICC, and with additional new authority. At the same time it imposed certain new obligations on the industry. For the first time, federal law imposed an obligation to interconnect or establish through routes with other common carriers. *See* 47 U.S.C. § 201(a) (1976). Many provisions of the 1934 Act were carried forward almost verbatim from the Mann-Elkins Act of 1910.[20] The 1934 Act also continued the previously applicable prohibition against unjust and unreasonable discriminations.[21]

As to tariffs, the 1934 Act continued the prior practice that tariffs be generated, at least in the first instance, by the carriers. Section 203 of the Act required that they be filed with the FCC, 47 U.S.C. § 203(a), that the FCC and the public be given 30 days notice of any proposed change, *id.* § 203(b), and that no charge be demanded or collected, refunded or remitted, or any service rendered, except in accordance with a filed tariff. *Id.* § 203(c). This section does no more than carry forward the prior obliga-

---

19. *See United States v. American Tel. & Tel. Co.*, 1 Decrees & Judgments in Civil Federal Antitrust Cases 554 (D.Ore.1914), *modified*, 1 Decrees & Judgments in Civil Federal Antitrust Cases 659 (D.Ore.1914), 1 Decrees & Judgments in Civil Federal Antitrust Cases 572 (D.Ore.1918), 1 Decrees & Judgments in Civil Federal Antitrust Cases 574 (D.Ore.1922).

20. *Compare* Mann-Elkins Act of 1910, ch. 309, § 7, 36 Stat. 539 ("just and reasonable" tariff requirement) *with* Communications Act of 1934, ch. 652, § 201, 48 Stat. 1064 (1934) (current version at 47 U.S.C. § 201(b)).

21. *Compare* Mann-Elkins Act of 1910, ch. 309, §§ 7, 12, 36 Stat. 539 (1910) *with* Communications Act of 1934, ch. 652, § 202, 43 Stat. 1064 (1934) (current version at 47 U.S.C. § 202(a)).

tion of telecommunications common carriers to avoid discriminations by adhering to filed tariffs. The FCC was, however, given two specific powers with respect to tariffs. In section 204 it was authorized, either after a complaint or on its own initiative, to conduct a hearing concerning the lawfulness of a filed tariff, and pending the completion of that hearing, to suspend its operation for no more than three months.[22] If at the end of three months the hearing has not been completed, the carrier initiated tariff would go into effect. In section 205(a) the FCC was authorized, after the hearing, "to determine and prescribe what will be the just and reasonable charge . . . to be thereafter observed, and what classification, regulation, or practice is or will be just, fair, and reasonable to be thereafter followed . . . ." 47 U.S.C. § 205(a). Thus the tariff scheme of the 1934 Act carries forward the pre-existing power of the ICC to review carrier initiated tariffs, and to enforce the obligation of fair and reasonable charges. Possibly the scope of FCC authority to review and change carrier initiated tariffs is somewhat broader than that formerly held by the ICC, since it covers classifications, regulations, and practices. But for reasons to which we refer hereafter, any difference in the scope of the two authorities is not critical to the analysis of the antitrust exemption issue.

Two other provisions of the 1934 Act bear on the exemption issue. The first is section 221(a), which carries forward the Willis-Graham Act's limited exemption from the Clayton Act for consolidations of local ser-

vice properties.[23] The other is section 414, which provides:

> Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

47 U.S.C. § 414 (1976). Finally, nothing in the 1934 Act expressly directs the FCC when exercising its section 205(a) authority, to take into account antitrust considerations, although undoubtedly they bear to some extent upon the fairness or reasonableness of the charges, classifications, regulations or practices of the carrier.

From the foregoing it appears that the 1934 Act, like the Interstate Commerce Act prior to its amendment by the Transportation Act of 1920, is designed essentially for the protection of telephone users in a rather limited way from discrimination in rates or service and from excess charges. Nothing in the Act suggests an intention on the part of Congress to regulate, or, indeed, to protect, equipment sellers or other competitors except insofar as they may also be customers for communication services. The Act does not impose on the telecommunications industry the kind of comprehensive regulation which, after 1920, the ICC exercised over the railroads. Moreover, the express exemption of the Willis-Graham Act carried forward in section 221(a), and the preservation of other remedies in section 414, suggest, when read together, that no blanket exemption from antitrust law was intended.[24] We recognize, however, that a given

---

22. 47 U.S.C. § 204, *as amended*, Pub.L.No.94–376, § 2, 90 Stat. 1080 (1976) (increasing period of suspension to five months).

23. 47 U.S.C. § 221(a) (1976) (originally enacted as Willis-Graham Act of 1921, ch. 20, 42 Stat. 27 (1921); *see* 78 Cong.Rec. 8822 (May 15, 1934) (remarks of Sen. Dill, sponsor) (with regard to areas outside specific exemption, bill examined "line by line, to see that it covered so far as possible all the existing law that is in the statutes which we are proposing to repeal, and also to see that it did not seriously conflict.").

24. *See United States v. Borden Co.*, 308 U.S. at 201, 60 S.Ct. 182 (express immunity and surrounding legislative history implies congressional intent that conduct not within exemption

is subject to antitrust laws); *Cain v. Air Cargo, Inc.*, 599 F.2d 316 (9th Cir. 1979); *Mt. Hood States, Inc. v. Greyhound Corp.*, 555 F.2d 687, 691 (9th Cir. 1977), *cert. denied on this ground*, 434 U.S. 1008, 98 S.Ct. 716, 54 L.Ed.2d 750 *rev'd on other grounds*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978). Although the existence of a savings clause will not deter necessarily the implication of immunity, *see Pan Am. World Airways, Inc. v. United States*, 371 U.S. at 321, 83 S.Ct. 476 (Brennan, J., dissenting) (implied immunity in CAB statutory framework that specifically refers to competition), it does provide in this particular regulatory scheme an affirmative statutory basis for applying the antitrust laws.

antitrust remedy might in specific instances present an actual or potential conflict with a duty imposed by the FCC in the exercise of its customer protective tariff jurisdiction.[25] Whether the instant claim presents such a conflict is the question to which we now turn.

### B. *The Antitrust Claims*

Since the determination of a possible antitrust exemption turns, in our view, on conflict, actual or potential, between an obligation imposed by the 1934 Act and an antitrust remedy, analysis must necessarily be discrete. AT&T's primary obligation under the 1934 Act is to adhere, in its dealings with customers, to its filed tariffs. That primary obligation is the heart of public utility regulation, because if carriers were free to depart from filed tariffs, the prohibition against discrimination among customers could be evaded. However, the filed tariff rule has little or nothing to do with AT&T's duties under the antitrust laws toward its competitors in the equipment supply business; competitors are not the intended beneficiaries of that rule of public utility regulation. This distinction was recognized over fifty years ago by Justice Brandeis in the leading case of *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In that case a railroad customer (shipper) sued for money damages under the antitrust laws alleging that the railroad tariffs filed with the ICC had been arrived at as a result of an unlawful conspiracy. Brandeis for a unanimous court sustained a demurrer to the complaint, observing:

> Section 7 of the Anti-Trust Act gives a right of action to one who has been "injured in his business or property." Inju-

ry implies violation of a legal right. The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier. . . . And they are not affected by the tort of a third party. . . . This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated. If a shipper could recover under § 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors.

*Id.* at 163, 43 S.Ct. at 49–50. Brandeis was dealing in 1922 with the interaction of a tariff scheme and an antitrust regime indistinguishable from the FCC tariff scheme and the antitrust regime now before us. If this suit were brought by Bell System customers for recovery of damages because the filed tariff imposed excess costs upon them, we would probably have to conclude that the filed tariff doctrine precluded treble damage recovery under section 4 of the Clayton Act. But the filed tariff doctrine does not confer immunity from antitrust liability generally.[26] Indeed in the *Keogh* case Brandeis observed:

> But under the Anti-Trust Act, a combination of carriers to fix reasonable and nondiscriminatory rates may be illegal; and if so, the Government may have redress by criminal proceedings under § 3, by

---

**25.** See *United States v. Nat'l Ass'n Sec. Dealers*, 422 U.S. at 730–35, 95 S.Ct. 2427 (immunity may be inferred if agency's exercise of authority is sufficiently pervasive to create actual or potential conflict).

**26.** See *Sound, Inc. v. American Tel. & Tel. Co.*, No. 76–186–2 (S.D. Iowa, Sept. 28, 1979); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 462 F.Supp. 1072, 1080–81, 1093 (N.D.Ill. 1978) (neither congressional intent nor cases support a blanket immunity for communica-

tions carriers and interconnection should not be impliedly immune) *aff'd sub nom. American Tel & Tel. Co. v. Grady*, 594 F.2d 594, *cert. denied, American Tel. & Tel. Co. v. MCI Communications Corp.*, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979); *Jarvis v. American Tel. & Tel. Co.*, 1978–1 Trade Cases ¶ 62,197 (D.C. 1978); *United States v. American Tel. & Tel. Co.*, 427 F.Supp. 57, 60 (D.D.C.1976), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977).

injunction under § 4, and by forfeiture under § 6. That was settled by *United States v. Trans-Missouri Freight Association*, 166 U.S. 290, [17 S.Ct. 540, 41 L.Ed. 1007,] and *United States v. Joint Traffic Association*, 171 U.S. 505 [, 19 S.Ct. 25, 43 L.Ed. 259.] The fact that these rates had been approved by the Commission would not, it seems, bar proceedings by the Government.

260 U.S. at 161–62, 43 S.Ct. at 49.

In this case the plaintiff is not suing in the capacity of a customer for communications services. Essential seeks recovery for injury to its business or property from actions taken by the defendants in formulating a tariff, and in rendering customer services. The Bell System will not be asked to disgorge to any customers any revenues derived under the filed tariff. Indeed, it can continue to collect those revenues until a new tariff is filed. There is no policy conflict, actual or potential, therefore, between the section 4 Clayton Act remedy and the antidiscrimination purposes of the filed tariff rule.

Arguably the claim for injunctive relief, which will, of course, operate prospectively, requires a different analysis than we have made respecting the claim for damages for past activities, although Justice Brandeis, in *Keogh*, apparently did not think so. As with the damage remedy, a discrete analysis is helpful. Under the 1934 Act two different kinds of tariffs may be involved. The first is a tariff initiated entirely by a carrier and filed pursuant to section 203. If an antitrust plaintiff establishes that such a tariff was devised for an anticompetitive purpose which cannot satisfy antitrust criteria, an injunction under section 16 of the Clayton Act could, it seems to us, require the filing of a new tariff, and the notice as required by section 203, without in any way

impinging upon the jurisdiction of the FCC. That agency's jurisdiction attaches under sections 204 and 205 only after a carrier filing, and carriers under section 203 remain free to change their filed tariffs at any time on appropriate notice. If, on the other hand, the FCC has conducted an investigation and made an order under section 205, there may be a potential for conflict between the two regulatory regimes. Here, again, the distinction between customer plaintiffs and noncustomer plaintiffs is probably significant because of the interaction between the common carrier's duty to offer service to all who seek it on reasonable terms and conditions and the antitrust considerations involved in permitting potential competitors in communication services to have access to the Bell System network. However, the federal courts, not the FCC, have the primary responsibility for the enforcement of the antitrust laws even in the customer access context. Thus, abdication of the responsibility for examining the prospective operation of a section 205 order ought not to be decided lightly. In this case, where the antitrust claim for prospective relief is advanced on behalf of an equipment supplier rather than a Bell System customer, undue deference to the agency may be even less appropriate, since customers, not equipment manufacturers, are the special responsibility of the FCC. Undoubtedly, the terms of a section 205 order must be taken into account in determining whether the restraint of trade charged in the complaint is unlawful, and if so, what prospective relief is appropriate. But we do not think that the presence of a section 205 order can wholly preclude a section 16 Clayton Act lawsuit; the mere potential for such an order is an a fortiori case.[27]

C. *The Commission's Tariff Activity*

With the foregoing principles in mind, we turn to the FCC tariff activity as it bears

---

**27.** *See International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.*, 518 F.2d 913, 918–19 (9th Cir. 1975) (Clayton Act proviso barring private injunction suit against common carriers regulated by ICC did not bar private injunction suit against telephone company regulated by FCC) *on remand*, 449 F.Supp. 1158, 1164–69 (D.C. Hawaii 1978); *MCI Communications Corp. v.*

*American Tel. & Tel. Co.*, 462 F.Supp. at 1100–02 (Communications Act does not provide exclusive remedies), *aff'd sub nom., American Tel. & Tel. Co. v. Grady*, 594 F.2d 594, *cert. denied, American Tel. & Tel. v. MCI Communications Corp.*, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979).

upon this case. Prior to 1968 only AT&T initiated tariffs were on file, and those flatly prohibited communications service customers from connecting electrically to Bell System lines any equipment not obtained from it.[28] In 1965, Thomas F. Carter filed a suit in the Northern District of Texas under the antitrust laws seeking damages and injunctive relief from AT&T and others because they would not permit Bell System customers to use his Carterfone device. The district court denied preliminary injunctive relief pending a determination by the FCC of the validity of the Bell System tariff, and the Fifth Circuit affirmed that denial. *Carter v. American Tel. & Tel. Co.,* 250 F.Supp. 188, 192 (N.D.Tex.), *aff'd,* 365 F.2d 486 (5th Cir. 1966), *cert. denied,* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). Then, for the first time, the FCC began an investigation, pursuant to sections 204 and 205, of the legality under the 1934 Act of the prohibition against connection of equipment obtained from other sources. In *In re Use of the Carterfone Device,* 13 F.C.C.2d 420, *reconsideration denied,* 14 F.C.C.2d 571 (1968), the FCC determined that the tariff was unreasonable within the meaning of section 201(b) of the Act, and requested the submission of new tariffs which would permit the use of other source equipment by customers, but would not adversely affect the telephone company's operations or the network's utility for others. In the proceedings before the FCC, AT&T maintained that it was essential to the integrity of the communications network that no electrical connection be made to it of equipment which its operating companies or manufacturing subsidiary had not examined

and supplied. The 1968 FCC order rejected that contention, 13 F.C.C.2d at 423, 424, while recognizing that integrity of the network was a legitimate concern. *Id.* at 425. In response to the FCC invitation, AT&T filed a new tariff permitting Bell System customers to protect their own equipment if they used carrier-supplied PCAs. The FCC was uncertain about the necessity for use of PCAs for the protection of the network, but in the absence of technical information it permitted the tariff to become effective without ruling explicitly on its legality.[29] Thus customers were required to lease PCAs from Bell System operating companies if they wanted to use their own telephone station equipment.

Between 1969 and 1972 the FCC conducted formal proceedings to assist in evaluation of the technical issues relating to the impact on network integrity of customer-owned equipment. On June 14, 1972, it instituted a Notice of Inquiry and Proposed Rulemaking aimed at determining the best approach to the problem.[30] The proceedings continued for several years. On November 7, 1975, two and one-half years after the filing of Essential's complaint in the district court, the FCC proposed a registration program for customer-supplied equipment.[31] That regulation permits direct attachment of customer-supplied equipment if the PCA or equipment is so registered with the FCC. Nonregistered equipment may be attached only through Bell System PCAs.

Thus the FCC activity which the defendants claim to be preemptive here is divided into three stages. Prior to the FCC decision in *Carterfone* in 1968 there was on file a carrier initiated tariff prohibiting any use

---

**28.** Tariff F.C.C. No. 132 ¶ B.7, B.24 (filed April 16, 1957), superseded by Tariff F.C.C. No. 263 ¶ 2.6.1, 2.6.9 (filed January 2, 1968) (corresponding paragraphs substantially the same).

**29.** *In re American Tel. & Tel. Co.,* "Foreign Attachment" Tariff Revisions, 15 F.C.C.2d 605, 610, 611 (1968), *reconsideration denied,* 18 F.C.C.2d 871, 874 (1969) (Tariff Nos. 259, 260, 263).

**30.** *See In re Proposals for New or Revised Classes of Interstate and Foreign MTS and WATS,* 35 F.C.C.2d 539 (1972).

**31.** *See* 40 Fed.Reg. 53,022 (1975), *codified at* 47 C.F.R. § 68 (1978). *See In re* Proposals for New or Revised Classes of Interstate and Foreign MTS and WATS, First Report and Order (Registration Decision), 56 F.C.C.2d 593, 614– 622 (1975), *on reconsideration,* 57 F.C.C.2d 1216, 58 F.C.C.2d 716, 59 F.C.C.2d 83 (1976), Second Report and Order, 58 F.C.C.2d 736 (1976), *on reconsideration,* 61 F.C.C.2d 396, 64 F.C.C.2d 1058, *aff'd sub nom. North Carolina Util. Comm'n v. FCC,* 552 F.2d 1036, 1056 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

of customer-supplied equipment. Since Essential was not in business during that period, that tariff bears on the issue of antitrust exemption only peripherally, if at all. Between 1968 and 1975 there was on file a carrier initiated tariff, filed in response to the *Carterfone* decision, permitting use of customer-supplied equipment only in conjunction with the use of Bell System PCAs. This is the period during which Essential allegedly suffered an injury to its business or property. Therefore, it is relevant to the viability of the section 4 Clayton Act claim. However, since the tariff that was in effect during the 1968–1975 period is no longer in effect, it will have no bearing upon the availability of prospective injunctive relief under section 16 of the Clayton Act. Finally, the post-1975 tariff, in effect today, may bear upon the scope of prospective injunctive relief sought under section 16.

The claim for money damages with respect to the 1968–1975 tariff is by a noncustomer. Therefore, it does not run afoul of the previously discussed binding effect, that exists between AT&T and its customers, of filed tariffs. Moreover, because the FCC never *required* the filing of the tariff in the form presented, no issue is presented of action taken under compulsion of law.[32]

Similarly no issue is presented of FCC approval. The FCC never approved the 1968–1975 tariff. Instead of holding a hearing immediately after the filing as permitted by the Act, the FCC told AT&T to file a tariff subject to later approval or disapproval in accordance with certain independent studies commissioned by the agency. In effect, the FCC suspended its judgment pending further study. We do not feel that this course of conduct rises to the level of agency approval that might require implied immunity. Postponement of action by the agency cannot be construed as approval requiring a court to refrain from enforcing the antitrust laws, especially where, as here, the agency ultimately declared the defendant's interim conduct improper. Thus we find no basis for the conclusion that the enforcement of section 4 of the Clayton Act in the form of money damages would present a conflict with the policies of the 1934 Act.

As to the claim under section 16 for injunctive relief, we hold that its dismissal on the pleadings cannot be affirmed. It is impossible to tell whether Essential could prove facts entitling it to injunctive relief. If injunctive relief were directed at NJ Bell's marketing and service activities, while refraining from alteration of the tariff imposed by the FCC in 1975, there would be no conflict between the tariff and the injunction. Moreover, while as between AT&T and its customers the FCC has the final word in service classifications, we are not prepared to hold, at the pleadings stage of an antitrust suit, that the FCC's tariff took insufficient account of third party competitive interests and ought to be modified. The separate question of whether a court before which a section 16 antitrust claim is pending is the appropriate forum for the consideration of such third party interests, or whether instead, for prospective relief from the operation of a tariff, Essential should be required to intervene in the FCC proceedings, exhaust administrative remedies, and then seek judicial review under 28 U.S.C. § 2342(1) (1976) and 47 U.S.C. § 402 (1976), is one which need not be answered at this time. Any injunction which may be granted might be narrow enough that that question will not arise. We hold only that the plaintiff could under the complaint prove some state of facts which might warrant injunctive relief under the antitrust laws, and that the complaint should not have been dismissed on the ground that the FCC tariffs made the defendants' activities exempt from antitrust scrutiny.

To the extent that the district court decisions in *Phonotele, Inc. v. American Tel. & Tel. Co.*, 435 F.Supp. 207 (C.D.Cal.1977), *appeal docketed* No. 77–3877 (9th Cir. Dec. 14,

---

**32.** *Cf. Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (compulsion under state law implies immunity).

1977); *DASA Corp. v. General Tel. Co.*, 1977–2 Trade Cases ¶ 61,610 (C.D.Cal.1977), *appeal docketed*, No. 77–2936 (9th Cir. Aug. 23, 1977) (*Phonotele* and *DASA* argued May 18, 1979); *Monitor Business Machines, Inc. v. American Tel. & Tel. Co.*, 1978–1 Trade Cases ¶ 62,030 (C.D.Cal.1978), and *Western Elec. Co. v. Milgo Elec. Corp.*, 1978–1 Trade Cases ¶ 61,960 (S.D.Fla.1976), *appeal dismissed*, 568 F.2d 1203 (5th Cir.) *cert. denied*, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978), reach different conclusions as to exemption, we find them unpersuasive.

## III. EXEMPTION BY VIRTUE OF STATE LAW

In Part II we have disposed of the ground on which the district court relied in dismissing the complaint. The defendants urge as a separate ground for affirmance that the PCA tariff, and its predecessor prohibition of customer-supplied equipment, merely paralleled the service obligations imposed upon it by state law. They rely particularly upon decisions in *Quick Action Collection Co. v. New York Tel. Co.*, [1920D] Pub.U. Rep. (PUR) 137, 143–44 (N.J.Bd.Pub.Util. Comm'rs), and In re *New Jersey Bell Tel. Co.*, 100 Pub.U.Rep. (PUR) 124, 127 (N.J.Bd. Pub.Util.Comm'rs 1953), which upheld the provisions of state tariff filings prohibiting connection of customer-owned equipment. Under the *Parker v. Brown* rule, they contend, these state law tariffs confer antitrust exemption.

There are several difficulties with this argument. The first is that the typical state regulatory scheme is essentially no different than that of the 1934 Act. It permits carriers to initiate tariffs, requires them to adhere strictly thereto in dealing with their customers, and permits their revision, in the interest of the customers, by a state regulatory agency.[33] The analysis which we made with respect to any conflict between federal antitrust law and federal utility regulation in Part II is equally appli-

cable here. A second, and we think insurmountable objection, is the holding in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) that the provisions of utility initiated tariff filings do not furnish a predicate for a *Parker v. Brown* exemption from antitrust claims by competitors injured as a result of compliance with the tariffs. The court's analysis in *Cantor* is entirely consistent with that which we made in Part II.

Finally, it is not at all clear that state law has any role in determining whether the Bell System could exclude customer-supplied equipment from attachment to its network. In the period between 1968 and 1975, while the FCC was investigating the technical ramifications of the PCA tariff, seventeen different state utility commissions undertook investigations of the same subject matter. This proliferation of possibly conflicting regulatory activity led the FCC to assert primacy in authority over the terms and conditions governing connection of customer-supplied equipment to the national network.[34] That ruling was challenged by a state regulatory commission, but was affirmed by a divided court.[35] As we noted above, the New Jersey Public Utilities Commission, following the *Telerent* holding, declined to pass upon the validity of the PCA tariff. We need not in this case decide whether the FCC authority totally preempts state authority in the field as the Fourth Circuit majority held, for even if there is room for state tariff regulation there is no room for a *Parker v. Brown* immunity from antitrust liability.

## IV. CONCLUSION

Our rejection of the claim of antitrust exemption requires that the judgment appealed from be reversed and the case remanded for further proceedings on the merits. Our discussion of the antitrust issues does not, of course, suggest that the con-

---

**33.** *See* N.J.Stat.Ann. §§ 48:2–1 to 72, 48:3–1 to 7.13 (West 1969).

**34.** *See In re Telerent Leasing Corp.*, 45 F.C. C.2d 204 (1974).

**35.** *North Carolina Util. Comm'n v. FCC*, 537 F.2d 787 (4th Cir.), *cert. denied*, 429 U.S. 1027 (1976), *reconsideration denied*, 552 F.2d 1036 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

duct complained of would, if proved, necessarily be found to have violated either section 1 or section 2 of the Sherman Act. We hold only that neither the FCC nor the state tariff regulatory schemes provide a basis for an implied exemption from those laws.