UNITED STATES TRANSMISSION SYSTEMS, INC., Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY; New England Telephone & Telegraph Company; New York Telephone Company; New Jersey Bell Telephone Company; The Bell Telephone Company of Pennsylvania; The Diamond State Telephone Company; The Chesapeake and Potomac Telephone Company; The Chesapeake and Potomac Telephone Company of Maryland; The Chesapeake and Potomac Telephone Company of Virginia; Southern Bell Telephone and Telegraph Company; South Central Bell Telephone Company; The Ohio Bell Telephone Company; Cincinnati Bell Inc.; Michigan Bell Telephone Company; Indiana Bell Telephone Company, Incorporated; Wisconsin Telephone Company; Illinois Bell Telephone Company; Northwestern Bell Telephone Company; Southwestern Bell Telephone Company; The Mountain States Telephone and Telegraph Company; The Pacific Telephone and Telegraph Company; Southern New England Telephone Company; Bell Telephone Co. of Nevada, Defendants.

No. 82 Civ. 1986 (RWS).

United States District Court,
S.D. New York.

March 16, 1983.

---

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff; Grant S. Lewis, John S. Kinzey, Jr., Charles C. Platt, and Howard A. White, Joseph J. Jacobs, Randall B. Lowe, New York City, of counsel.

Jim G. Kilpatric, William J. Jones, A.J. Kent, New York City, Sidley & Austin, Chicago, Ill., Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant American Tel. and Tel. Co.; George Saunders, Jr., John C. Woulfe, Chicago, Ill., Leonard Joseph, New York City, of counsel.

## OPINION

SWEET, District Judge.

Defendants American Telephone and Telegraph Company ("AT & T") and twenty-two of its twenty-four operating companies

have moved pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) to dismiss the complaint of plaintiff United States Transmissions Systems, Inc. ("USTS") alleging violations of sections 1 and 2 of the Sherman Act 15 U.S.C. §§ 1 & 2 and sections 201(b) and 202 of the Communications Act of 1934, 47 U.S.C. §§ 201(b) and 202 and pursuant to Fed.R.Civ.P. 56(b) for partial summary judgment. For the reasons set forth below, the motion to dismiss will be denied and the motion for partial summary judgment will be granted.[1]

## Background

This motion involves an initial skirmish between AT & T and one of its many attackers in the intricate battle for new rights, rates, and practices in the telecommunications industry. Here USTS seeks to recover monetary damages for past practices alleged to constitute a Sherman Act violation and injunctive relief against present practices relating principally to AT & T's ENFIA rates and services. ENFIA is an acronym for Exchange Network Facilities for Interstate Access, which are the facilities that local telephone companies provide to USTS and other companies that offer interstate long distance services.[2] USTS claims that the ENFIA rates and services constitute an unreasonable restraint of trade in violation of section 1, and that AT & T along with its local operating companies have attempted to monopolize, monopolized, and combined and conspired to monopolize the market for long distance telephone service in violation of section 2.

The motion to dismiss is not directed to the merits of USTS's claim but is based on AT & T's claim of implied immunity, namely, that the conduct in issue here is immune from the antitrust laws because it has been approved by the Federal Communications Commission ("FCC") and remains the sub-ject of FCC regulation. AT & T also seeks a dismissal of certain claims as a consequence of a release executed by the parent of USTS.

## The Parties

USTS is a Delaware corporation with its principal place of business in New Jersey. Its common stock is wholly owned, through two intervening subsidiaries, by International Telephone and Telegraph Corporation ("ITT"). USTS is a common carrier of telecommunication services and offers a long distance telephone service known as "City Call" which is competitive with AT & T's long distance services.

In the words of our Court of Appeals, AT & T is "a mammoth and legendary enterprise." *Northeastern Telephone Co. v. AT & T,* 651 F.2d 76, 79 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). It is a New York corporation with its principal place of business here. Through its Long Lines Department AT & T is the principal carrier of long distance service within the United States. AT & T owns, in whole in part, twenty-four local telephone companies known as the Bell System Operating Companies ("BSOC"). Twenty-two of the BSOCs are defendants here. The other two are named as coconspirators. Each has a monopoly over local telephone services within its geographic area and controls the access to over eighty percent of the telephones in the United States. Nearly all the BSOCs will soon be divested by AT & T pursuant to the consent decree in *United States v. AT & T,* No. 74-1698 (D.D.C.).

## The History of this Controversy

Prior to 1969, long distance service in this country was provided by AT & T's Long Lines Department. In 1969, the FCC approved a proposal by Microwave Communi-

---

1. Argument on this motion was had on October 15, 1982 and the parties' final submission was received on March 7, 1983.

2. There is obviously a sophisticated vocabulary which has developed in the communications law field. The following glossary applies to the terms employed in this opinion.
   BSOC  Bell System Operating Companies

ENFIA  An acronym for "Exchange Network Facilities for Interstate Access"
FCC  Federal Communications Commission
MCI  MCI Telecommunications Corporation
MTS  Message tele-communications service
OCC  Other Common Carriers
WATS  Wide area telecommunications service

cations, Inc. ("MCI") to provide an intercity point-to-point private line service that did not utilize the switching networks operated by the local companies.[3] *Microwave Communications, Inc.,* 18 F.C.C.2d 953 (1969); 21 F.C.C.2d 190 (1970). In 1971, the FCC issued its well-known *Specialized Common Carriers* decision, which authorized MCI and other common carriers ("OCCs") to provide private line service. 29 F.C.C.2d 870 (1971), *aff'd sub nom. Washington Utilities & Transp. Comm'n v. FCC,* 513 F.2d 1142 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

Thereafter, the OCCs sought access to AT & T's local networks in order to provide a private line service known as "foreign exchange" ("FX"), which permits a customer in one city to obtain local business line service in a distant city or exchange area without incurring a toll charge. *See New York Telephone Co. v. FCC,* 631 F.2d 1059, 1061 n. 1 (2d Cir.1980). AT & T initially took the position that the *Specialized Common Carrier* decision did not require the BSOCs to provide the OCCs with such access to their local networks. The FCC disagreed and ordered AT & T to provide the interconnections for the FX services. *Bell System Tariff Offerings,* 46 F.C.C.2d 413, *aff'd sub nom. Bell Telephone Co. v. FCC,* 503 F.2d 1250 (3d Cir.1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975).

In 1974, MCI revised its tariffs seeking to offer a service it termed "Execunet," which would involve ordinary switched long distance service in competition with AT & T's long distance service. The FCC declared the tariff illegal, interpreting its *Specialized Common Carrier* decision to limit MCI's offerings to private line services. On review, the Court of Appeals for the District of

Columbia Circuit remanded the case for consideration of whether the Execunet service was in the public interest, *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977) ("Execunet I"), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978). In response, the FCC initiated an administrative proceeding to make this determination. FCC Docket No. 78–72, *MTS and WATS Market Structure,* 67 F.C.C.2d 757 (1978). At the same time, the FCC issued a declaratory ruling that the BSOCs were not required to provide interconnections until conclusion of the administrative proceeding. This ruling was overturned on review by the D.C.Circuit, which held that the OCCs were to be afforded interconnections until and unless the public interest demanded otherwise. *MCI Telecommunications Corp. v. FCC,* 580 F.2d 590 (D.C.Cir.) ("Execunet II"), *cert. denied,* 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978).

After the Execunet II decision, it was obvious that the OCCs would be permitted to offer long distance service in competition with AT & T and the independent telephone companies. Accordingly, in May, 1978, AT & T filed its first ENFIA tariff, which drew heated criticism from the OCCs, and resulted in negotiations among the FCC, AT & T and the OCCs, culminating in an "Interim Settlement Agreement" (the "Agreement"). The Agreement, executed in December, 1978, sets forth the basic terms and conditions for OCC access to the BSOC plants and provided a formula for access rates. The Agreement was designed to be in effect for an interim period until the FCC concluded its *MTS and WATS Market Structure* proceeding. *Exchange Network Facilities,* 71 F.C.C.2d 440 (1979).[4]

---

**3.** Private line service offers to users "dedicated" circuits between designated geographical points on a continuous and exclusive basis for a fixed monthly charge. For example, businesses often have private line service between company headquarters and branch offices or factories. Private line service differs from ordinary long distance service—known as message telecommunications service ("MTS")—in that with MTS the user may call telephones

throughout the country connected into the public switched telephone network and is charged on a per-call basis.

**4.** The Agreement was signed by USTS's corporate predecessor, ITT Corporate Communications Services ("ITT–CCS"). For the purposes of this motion, USTS admits that the actions of ITT–CCS are attributable to it.

The Agreement is still in effect. In accordance with its terms it was extended in April, 1982 for a two-year period. *Exchange Network Facilities,* 90 F.C.C.2d 6 (1982).

The *MTS and WATS Market Structure* proceeding still continues. On December 23, 1982, the FCC issued a press release announcing that it has adopted rules pursuant to which the relevant access rates will be determined. The release states that the FCC's action establishes a long-range plan with the rules to become effective on January 1, 1984. Accompanying statements by some of the commissioners describe the FCC's decision as "difficult," "momentous," and "historic." The release also noted that the FCC's plan seeks to balance the proceeding's four basic goals, namely: "(1) the continued assurance of universal service; (2) the elimination of unjust discrimination or unlawful preferential rates; (3) the encouragement of network efficiency; and (4) the prevention of uneconomic bypass." On February 28, 1983, the FCC issued its order implementing this decision.

Thus, the Interim Settlement Agreement remains in effect, and it is primarily, although not exclusively, the FCC's action with respect to the Agreement that AT & T urges exempts its challenged conduct from antitrust scrutiny. For example, AT & T contends that the ENFIA rates charged in accordance with the Agreement have been expressly approved by the FCC and that they therefore cannot be made the subject of an antitrust claim for damages. USTS asserts, on the other hand, that the FCC action regarding the Agreement is not sufficient to exempt the rates charges from the antitrust laws.

As already noted, the Agreement was the result of a negotiation process among the FCC, AT & T, and the OCCs, resulting primarily from the May, 1978 AT & T ENFIA tariff. As required by the Agreement, AT & T and the OCCs jointly applied to the

FCC to allow it to go into effect. In granting the application, the FCC noted:

At that time [when the ENFIA tariff was filed] we had recently sought comment from the public on the scope and nature of issues which we should address in the [MTS/WATS] *Market Inquiry,* and we were receiving voluminous filings concerning not the answers, but the questions to ask. It was quite clear that any process leading to prescription of the ENFIA rates could well transcend the [MTS/WATS] *Market Inquiry* itself. But, it was equally clear that the ENFIA issues had to be resolved expeditiously. The specialized common carriers had a court-granted legal right to secure interconnection. Absent some determination as to the compensation to which local telephone companies would be entitled for this, at best protracted litigation seemed likely to ensue. For this reason, it was appropriate for us to convene negotiations, as suggested by NTIA, with a view towards determining whether some interim agreement, *consistent with the public interest but short of the rigor necessary to support FCC prescription,* would be possible.

71 F.C.C.2d at 453 (emphasis added).[5] The Commission summarized its conclusions as follows:

[W]e approve the negotiation process and the agreement it resulted in as being a reasonable means of avoiding complex and protracted litigation of hotly contested issues among historically litigious parties, as conducive to the ends of justice, and therefore, at least for the interim, as in the public interest. As was noted by the parties and in comments herein, the settlement affords an expeditious and acceptable compromise of differences on matters relating to methodologies, rate levels and rate components which would otherwise necessitate substantial time, expense and effort to resolve through formal Commission processes (and likely appellate review). Thus, we are allowing

---

5. The FCC also noted that it had "convened the negotiations with the objective of arriving, if possible and if consistent with the public inter-

est, at some form of a 'rough justice' interim approach." 71 F.C.C.2d at 443.

tariffs and contracts which implement the agreement to be filed, subject to our discussion of the independent nature of the VGCOCF component.

*Id.* at 456. In extending the Agreement in April, 1982, the Commission noted that:

We have determined that this decision is based upon essentially the same considerations which led us to conclude that the public interest would be served by approving the original agreement.

90 F.C.C.2d at 10. In addition, the Agreement itself provides that:

The terms agreed to are without prejudice to the right of each party to take different and inconsistent positions in any forum or proceeding. Notwithstanding the foregoing, the undersigned parties further agree that they will not attack or challenge this Interim Settlement Agreement or the lawfulness thereof, nor shall they rely upon it, in whole in part, in any forum, or proceeding other than a proceeding directed to the interpretation or enforcement of this Interim Settlement Agreement.

Finally, the FCC noted the ENFIA Agreement briefly in its February 28, 1983 Report in the *MTS and WATS Market Structure* proceeding, stating that it had previously "concluded that allowing the negotiated rate for an interim period would serve the public interest." Slip op. at 8.

*The Release*

In the course of the settlement of an action instituted in this court in 1977, *International Telephone & Telegraph Corp. v. AT & T,* No. 77 Civ. 2854, ITT, USTS's parent corporation, executed a release (the "Release") on February 27, 1980. The Release discharged AT & T and the BSOCs from liability for antitrust damages prior to its effective date, and USTS concedes such a discharge. USTS does not concede that the release covers its claims under the Communications Act, but notes that this point is academic since those claims are subject to a two-year statute of limitations, 47 U.S.C. § 415(b), and this lawsuit was commenced on March 30, 1982.

*The Federal Regulatory Scheme for Tele-communications*

Federal regulation of communication common carriers began with an amendment of the Interstate Commerce Act, in which communications carriers were brought under the jurisdiction of the Interstate Commerce Commission and were governed by the provisions of the Interstate Commerce Act. Mann-Elkins Act of 1910, 36 Stat. 539, 61st Cong., 2d Sess. (1910).

In 1934, Congress enacted the Federal Communications Act, which severed regulation of the telephone, telegraph, and radio industries from the Interstate Commerce Commission and invested regulation over these industries in the newly created Federal Communications Commission. 47 U.S.C. §§ 151 *et seq.* The Act divided the regulated industries into common carriers, such as the telephone and telegraph companies, and radio broadcasters, and imposed stricter and more numerous regulatory controls over the common carriers. *See United States v. RCA,* 358 U.S. 334, 348–50, 79 S.Ct. 457, 465–67, 3 L.Ed.2d 354 (1959).

The FCC regulates the common carriers under a public interest standard. *See* 47 U.S.C. §§ 201, 214. Competition is a relevant factor in appraising the public interest, but others are relevant also:

[D]eterminations of whether a company's practices are in the public interest as defined by the [Communications] Act require FCC consideration of factors other than competition. Such factors include network safety and efficiency, the need of the public for reliable service at reasonable rates, the proper allocation of the rate burden, the financial integrity of the carriers, and the future needs of both users and carriers.

*Phonetele, Inc. v. American Tel. & Tel. Co.,* 664 F.2d 716, 722 (9th Cir.1981) (footnote omitted), *cert. denied,* —— U.S. ——, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983). *See also FCC v. RCA Communications, Inc.,* 346 U.S. 86, 93, 73 S.Ct. 998, 1003, 97 L.Ed. 1470 (1953); *Hawaiian Tel. Co. v. FCC,* 498 F.2d 771, 777 (D.C.Cir.1974).

With respect to tariffs, the 1934 Act continued the prior practice that tariffs be generated, at least in the first instance, by the carriers themselves. Under section 203(a) of the Act, these tariffs must be filed with the FCC, and carriers must give the FCC and the public ninety days notice of any proposed changes. 47 U.S.C. § 203(a) (1976); 47 U.S.C. § 203(b). No charge may be demanded or collected, or any service rendered, except in accordance with a filed tariff. *Id.* § 203(c). Section 204 of the Act further authorized the FCC, either *sua sponte* or upon request, to conduct a hearing concerning the lawfulness of the rates embodied in a proposed tariff and to suspend operation of the tariff for up to five months. *Id.* § 204. Unless otherwise acted upon, the tariff becomes effective no later than ninety days after its filing. *Id.* § 203(b)(1). FCC approval is thus not a prerequisite to a tariff taking effect. Once a tariff becomes effective, it binds the carrier and customer alike until it is modified or superseded. *Id.* § 204(a).

If the Commission determines that the new tariff does not meet the requirements of the Act, it may prescribe a "just and reasonable" substitute, or set maximum and/or minimum charges to be observed. *Id.* § 205; *see American Broadcasting Companies v. FCC,* 643 F.2d 818, 822 (D.C.Cir. 1980). Any carrier that knowingly fails to obey an FCC order issued under this section is liable for a fine of $1,000 per violation per day. In addition, any common carrier which does or causes to be done any act prohibited or declared unlawful by the Communications Act shall be liable "to the person or persons so injured thereby for the full amount of damages," plus attorneys' fees. 47 U.S.C. § 206 (1976).

*Antitrust Immunity*

By this motion AT & T seeks to bar the relief sought by USTS by invocation of the implied immunity doctrine. AT & T contends first that the claim for damages for past conduct is precluded by FCC's "approval" of the Interim Settlement Agreement as in the public interest.[6] AT & T's second contention is that USTS's claim for injunctive relief is precluded by the FCC's regulatory activity in the *MTS and WATS Market Structure* proceeding. This argument is essentially to the effect that the FCC's final decision in that proceeding will determine the future rates and practices that are the subject of USTS's claim and that this court may not interfere with the FCC action.

The interplay of regulatory regimes with the antitrust laws has been a problem for the courts. In the telecommunications area the claim of implied immunity has been raised frequently with little success. *See, e.g., MCI Communications Corp. v. AT & T,* 708 F.2d 1081 (7th Cir.1983); *Phonetele, Inc. v. AT & T,* 664 F.2d 716 (9th Cir.1981), *cert. denied,* — U.S. —, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983); *Northeastern Telephone Co. v. AT & T,* 651 F.2d 76 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *Sound, Inc. v. AT & T,* 631 F.2d 1324 (8th Cir.1980); *Mid-Texas Communications Systems, Inc. v. AT & T,* 615 F.2d 1372 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Essential Communications Systems, Inc. v. AT & T,* 610 F.2d 1114 (3d Cir.1979). *But see Southern Pacific Communications Co. v. AT & T,* 556 F.Supp. 825 (D.D.C.1982). The many decisions holding that FCC regulation does not preclude antitrust scrutiny, coupled with the nascent state of this lawsuit, compel a considerable degree of caution. Nonetheless, while a blank slate is not presented, this case does involve unique facts not yet ruled upon that require examination in light of the relevant authority.

---

6. At various points in its submissions AT & T also states that the FCC has "exclusive jurisdiction" over the conduct at issue here. The use of such labels are generally of little use and will be avoided here in favor of an analysis of the underlying issues. *See Phonetele, Inc. v. AT & T, supra,* 664 F.2d at 727; 1 P. Areeda and D. Turner, *Antitrust Law* ¶ 223h (1978). Indeed, the arguments in AT & T's memoranda are not directed to the exclusive jurisdiction issue, but instead argue that the FCC has approved the conduct at issue, thereby conferring immunity.

One aspect of AT & T's claim, however, can be disposed of based on prior holdings by other courts. To the extent that AT & T grounds its claim of immunity on the FCC's "pervasive regulation" of the telecommunications industry, the claim must be rejected. As our Court of Appeals has phrased it, the issue is whether the regulatory scheme in question is "so pervasive that Congress must be assumed to have forsworn the paradigm of competition." *Northeastern Telephone Co. v. AT & T, supra,* 651 F.2d at 82 (citing cases). It is sufficient to rely on the authority of the cases cited above to conclude that this assumption does not hold in the case of the FCC's regulation of the telecommunications industry in general. Thus, the issue here is not the breadth of regulation within the industry, but the impact of regulation on the challenged conduct. *See id.;*[7] 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 223b at 138 (1978) [hereinafter cited as "Areeda & Turner"]. Furthermore, implied immunity is appropriate "only if necessary to make the [regulatory scheme] work, and even then only to the minimum extent necessary," *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963), and only in cases where there is a "plain repugnancy between the antitrust and regulatory provisions," *Gordon v. New York Stock Exchange,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975) (quoting *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963)).

## I. The Claim for Damages

There is authority for the proposition that FCC "approval" or "express authorization" of a particular practice may exempt it from challenge under the antitrust laws because antitrust liability in the face of such approval will create an impermissible conflict between the antitrust and regulatory laws. *See, e.g., MCI Communications Corp. v. AT & T, supra,* slip op. at 34; *Northeastern Telephone Co. v. AT & T, supra,* 651 F.2d at 82–84; *MCI Communications Corp. v. AT & T,* 462 F.Supp. 1072, 1098–99 (N.D.Ill.), *aff'd sub nom. AT & T v. Grady,* 594 F.2d 594 (7th Cir.1978), *cert. denied,* 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979). *See also Phonetele, Inc. v. AT & T, supra,* 664 F.2d at 730; *Essential Communications Corp., supra,* 610 F.2d at 1124.[8] The precise contours of this doctrine are not clear from the decisions, however, because each has found insufficient "ap-

---

**7.** In *Northeastern Telephone Co. v. AT & T, supra,* our Court of Appeals stated that there are two narrowly-defined situations in which "repeal" of the Sherman Act will be inferred: "first, when an agency, acting pursuant to a specific Congressional directive, actively regulates the particular conduct challenged," 651 F.2d at 82 (citing *Gordon v. New York Stock Exchange,* 422 U.S. 659, 685–86, 95 S.Ct. 2598, 2612–13, 45 L.Ed.2d 463 (1975)), and second, the pervasive regulatory scheme standard already discussed, 651 F.2d at 82 (citing *United States v. National Ass'n of Securities Dealers, Inc.,* 422 U.S. 694, 730, 95 S.Ct. 2427, 2448, 45 L.Ed.2d 486 (1975); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 373–74, 93 S.Ct. 1022, 1027–28, 35 L.Ed.2d 359 (1973)). As USTS notes, the Communications Act of 1934 does not expressly authorize the FCC to approve access charges for local exchange facilities, a not surprising result given the state of the industry in 1934. Discussion of the issue in the *Northeastern* opinion suggests that the authority must be quite clear-cut, 651 F.2d at 83 (Act does not expressly authorize FCC to approve protective coupler designs in issue there). From this USTS argues that applica-

tion of the *Northeastern* standard must inevitably lead to rejection of AT & T's claim of immunity without further analysis.

This court does not read the *Northeastern* opinion so narrowly. The court's discussion of the second category of implied immunity situations, where there is "pervasive regulation," involves not simply examination of the overall regulatory scheme, but a focused inquiry on the regulation of the conduct in question. The court performed that inquiry and concluded FCC regulation was not such as to create a conflict between the Communications Act and the antitrust laws if antitrust liability were found. *Id.* at 83–84. That inquiry is undertaken with respect to the instant case below.

**8.** Cf. *Hughes Tool Co. v. Trans World Airlines,* 409 U.S. 363, 387, 93 S.Ct. 647, 660, 34 L.Ed.2d 577 (1973) (Civil Aeronautics Board).

The FCC has taken the position that antitrust immunity inheres when it has "prescribed or specifically approved a tariff." *Memorandum of FCC as Amicus Curiae* in *United States v. AT & T,* No. 74–1698 (D.D.C.), reprinted in 62 F.C.C.2d 1102, 1115 (1975).

proval" to create a danger of conflict significant enough to warrant an ouster of antitrust jurisdiction.

■ Similarly, on the record before this court at this stage of the litigation of this dispute, it is not possible to conclude that the FCC action with respect to the Agreement was of such a character as to place AT & T's rates and practices under the Agreement beyond the challenge of the Sherman Act. Indeed, the FCC's own comments at the time it allowed the Agreement to go into effect reveal the relatively cursory analysis performed. In tracing the reasons why the ENFIA negotiations process was instituted, the FCC noted that issues had been raised in the opposition to the ENFIA tariff that would require evidence that did not then exist, but that the need to address ENFIA expeditiously necessitated an interim agreement that was "consistent with the public interest but short of the rigor necessary to support FCC prescription." 71 F.C.C.2d at 453.[9] The FCC also noted that it was allowing certain aspects of the Agreement to go into effect without sufficient evidence to assess whether and to what extent they were desirable in the public interest. *Id.* at 455–56.

Furthermore, the FCC summarized its discussion by stating that it "approve[d] the negotiations process and the agreement it resulted in as being a reasonable means of avoiding complex and protracted litigation or hotly contested issues among historically litigious parties, as conducive to the ends of justice, and therefore, at least for the interim, as in the public interest." *Id.* at 456. In addition, the FCC recently characterized its action with respect to the Agreement as involving a conclusion that "allowing the negotiated rate for an interim period would serve the public interest." *MTS and WATS Market Structure,* Docket No. 78–72, Third Report and Order, slip op. at 8 (Feb. 28, 1983). The FCC did not find the ENFIA rates and practices to be just and reasonable, 47 U.S.C. § 201(b), nor has it found them nondiscriminatory, 47 U.S.C. § 202(a). It has allowed the Agreement to go into effect, and extended it, to provide a framework through which the OCCs could provide services on an interim basis during the pendency of the *MTS and WATS Market Structure* proceeding. The FCC's action in the ENFIA proceedings does not demonstrate that to subject the rates and practices embodied in the Agreement to antitrust scrutiny would frustrate regulation of this aspect of the telecommunications industry. *See Phonetele, Inc. v. AT & T, supra,* 664 F.2d at 733; *Northeastern Telephone Co. v. AT & T, supra,* 651 F.2d at 83.[10]

### 2. The Claim for Injunctive Relief

■ USTS seeks injunctive relief regarding future rates and practices for ENFIA

9. The FCC stated that without an interim agreement, "at best protracted litigation seemed likely to ensue." 71 F.C.C.2d at 453. Unfortunately, these fears eventuated despite the agreement.

10. A key factor to some of the courts that have faced AT & T's claims of immunity is the fact that the primary responsibility for formulating rates and practices lies with AT & T and not the regulators. Thus, the Seventh Circuit recently rejected arguments similar to those here noting that where "the pricing decisions complained of are more the result of business judgment than regulatory coercion, and the FCC has neither dictated nor approved of those decisions, the challenged rate filings are not immune from antitrust scrutiny." Slip op. at 34. *See Phonetele, Inc. v. AT & T, supra,* 664 F.2d at 727 n. 32, 733; *Sound, Inc. v. AT & T, supra,* 631 F.2d at 1330–31; *Essential Communications Systems, Inc. v. AT & T, supra,* 610 F.2d at 1124. *Cf. Otter Tail Power Co. v. United States, supra,* 410 U.S. at 374, 93 S.Ct. at 1028 ("When these relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws."). Here it is evident that the terms were not the result of agency coercion. The Agreement "resulted from public negotiations among the signing parties, attended by other interested members of the public and conducted under FCC sponsorship." *Exchange Network Facilities for Interstate Access, supra,* 71 F.C.C.2d at 440. *Cf. Cantor v. Detroit Edison Co.,* 428 U.S. 579, 594, 96 S.Ct. 3110, 3119, 49 L.Ed.2d 1141 (1976) (defendant utility's participation in state regulatory decision was sufficiently significant to require that its conduct implementing the decision conform to applicable federal law).

interconnections. AT & T asserts that because these rates and practices are the subject of the *MTS and WATS Market Structure* proceeding, that this claim should be dismissed. AT & T's argument is that this claim is not justiciable because any conduct with respect to interconnections is solely within the domain of the agency in the *MTS and WATS Market Structure* proceeding. In addition, AT & T argues that to the extent USTS seeks rates and services from the BSOCs on an equal basis with AT & T's Long Lines Department, this claim is moot as a result of the modified consent judgment entered in *United States v. Western Electric Co.,* 552 F.Supp. 131 (D.D.C.1982), which stipulates that the divested BSOCs will provide access to interexchange carriers "that is equal in type, quality, and price to that provided to AT & T and its affiliates."

AT & T's contentions are really a claim of antitrust immunity, in that they are based on the premise that any future activity will be beyond the bounds of antitrust scrutiny because of agency action. This court sees no reason to dismiss the claim for injunctive relief at the pleading stage. To the extent that it may be moot, it will not be pursued. To the extent that it may not be moot, it is impossible to tell at this juncture whether USTS will be able to establish that it is entitled to injunctive relief. Further, it may be possible to tailor injunctive relief, if it is warranted, in a sufficiently narrow fashion so that the regulatory goals of the FCC are not frustrated. *See Essential Communications Systems, Inc. v. AT & T, supra,* 610 F.2d at 1124 (reversing district court dismissal of claim for injunctive relief at pleading stage). *See also* Comment, *The Application of Antitrust Law to Telecommunications,* 69 Calif.L.Rev. 497, 524–25 (1981).

*Conclusion*

In sum, AT & T's motion to dismiss on grounds of implied immunity based upon FCC action with respect to the Agreement will be denied. This denial, of course, does not prejudice AT & T to raise a similar contention based upon other or future regulatory action.

■ Along these lines, it is important to note that the antitrust laws have traditionally been applied flexibly, taking into account the peculiarities of the particular industry under consideration. This is especially so in the case of regulated industries. *See* Areeda & Turner, *supra,* ¶ 233d. Under these circumstances, labels such as "primary jurisdiction," "exclusive jurisdiction," or, indeed, "implied immunity" serve more to confuse than enlighten. *See Phonetele, Inc. v. AT & T, supra,* 664 F.2d at 727 (eschewing "elaborate taxonomies that have attempted to wrest an abstract framework out of the law"). The question is really one of how to accomplish the goals of the antitrust laws in light of the realities of the regulatory supervision imposed. It may well be that this question is adequately answered by engaging in traditional antitrust analysis to determine in a section 1 case whether or not a given restraint is unreasonable and with respect to a section 2 whether or not the defendant possesses market power that has been exercised improperly. *See id.* at 737–38.

In view of USTS's concession regarding the Release, partial summary judgment is granted to limit its claims.

A pretrial conference will be held on April 5 at 4:30 p.m. or at such other time as is convenient to the parties to schedule further proceedings in this action.

IT IS SO ORDERED.