760 F.2d 1347
 1985-1 Trade Cases 66,549
 SQUARE D COMPANY and Big D Building Supply Corp., Plaintiff-Appellants,
v.
NIAGARA FRONTIER TARIFF BUREAU, INC.; Bondy Cartage
Limited; Dominion-Consolidated Truck Lines, Limited; ICL
International Carriers Limited; Inter-City Truck Lines
(Canada), Inc.; TNT Canada, Inc., Defendant-Appellees.
 No. 669, Docket 84-7831.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 14, 1985.
Decided April 9, 1985.
 
 Douglas V. Rigler, Washington, D.C. (Linda H. Kamm, Michael Fischer, Foley & Lardner, Washington, D.C.; Joseph E. Zdarsky, Kavinoky & Cook, Buffalo, N.Y.), for plaintiff-appellant, Square D. Co.
 H. Laddie Montague, Alan M. Sandals, Berger & Montague, P.C., Philadelphia, Pa.; Arnold Levin, Howard Sedran, Levin and Fishbein, Philadelphia, Pa., for plaintiff-appellant, Big D Bldg. Supply Corp.
 Donald L. Flexner, Washington, D.C. (William Randolph Smith, Lisa B. Rovin, Crowell & Moring, Washington, D.C.), for defendant-appellee, Dominion-Consol. Truck Lines, Ltd.
 Lester M. Bridgeman, Louis E. Emery, Bridgeman & Urbancyzk, Washington, D.C., for defendant-appellee, Inter-City Truck Lines (Canada) Inc.
 Bryce Rea, Jr., Donald E. Cross, Rea, Cross & Auchincloss, Washington, D.C.; Sanford M. Litvack, Clark E. Walter, Donovan, Leisure, Newton & Irvine, New York City, for defendant-appellee, Niagara Frontier Bureau, Inc.
 Peter A. Greene, Charles L. Freed, Thompson, Hine & Flory, Washington, D.C., for defendant-appellee, ICL Intern. Carriers Ltd.
 John W. Bryant, Eames, Wilcock, Mastej & Bryant, Detroit, Mich., for defendant-appellee, Bondy Cartage Ltd.
 Peter D. Standish, Joel B. Harris, Weil, Gotshal & Manges, New York City, for defendant-appellee, TNT Canada, Inc.
 Before FEINBERG, Chief Judge, FRIENDLY and KAUFMAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This is an appeal from an order of the District Court for the Western District of New York, Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 596 F.Supp. 153 (1984), which dismissed appellants' complaints under Secs. 4 and 16 of the Clayton Act, 15 U.S.C. Secs. 15, 26, for failure to state a claim on which relief can be granted. The principal issue is whether Keogh v. Chicago & N.W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), has been overruled so far as its language extends to rates filed with but not investigated and approved by the Interstate Commerce Commission ("ICC"), or, failing that, whether the reasoning underlying that language is so much in conflict with later developments that an inferior court should disregard it. While agreeing with appellants that much of the reasoning of Keogh seems outdated, we hold that its language has not been overruled and that if there is to be an overruling, that task is for the Supreme Court. We therefore affirm the district court's principal ruling. However, we also hold that appellants' request for injunctive relief was prematurely dismissed and that appellants should be allowed to replead their damages claims, if they so choose and properly can, to allege injury they have suffered as a consequence of acts of the defendants other than the fixing of rates.
 
 
 2
 The case before us is a consolidation of two separately filed suits. Both appellants, who were plaintiffs below, are corporations that purchase from the defendants freight transport by motor carrier between the United States and Canada. Appellee Niagara Frontier Tariff Bureau, Inc. ("NFTB") is a rate bureau whose permissible activities are described in an agreement filed with and approved by the ICC. Niagara Frontier Tariff Bureau, Inc.--Agreement, 297 I.C.C. 494 (1955). The other appellees are Canadian motor carriers engaged in the transportation of freight between the United States and Canada. Both complaints were brought on behalf of appellants individually and as representatives of a class comprised of all other persons and businesses who purchased from defendants freight transport between the United States and the Province of Ontario, Canada.
 
 
 3
 The complaints alleged substantially as follows:[1] Each of the motor carrier appellees was a party to the collective ratemaking agreement approved by the ICC for the NFTB, which authorized the members of the NFTB to set rates collectively for motor carrier freight traffic between the United States and Canada through authorized committees if the motor carriers adhered to the procedures set forth in the agreement and in ICC regulations. In accordance with the requirements of the Reed-Bulwinkle Act, 49 U.S.C. Sec. 10706(b)(3)(B)(ii) (as amended), the rate bureau agreement preserved the right of each carrier to take independent action. The complaints alleged that at least as early as 1966 and continuing at least into 1981, appellees engaged in a conspiracy "to fix, raise and maintain prices and to inhibit or eliminate competition for the transportation of freight by motor carrier between the United States and the Province of Ontario, Canada without complying with the terms of the NFTB agreement and by otherwise engaging in conduct that either was not or could not be approved by the ICC." More specifically, it was alleged that the appellees established a "Principals Committee" composed of the senior management officials of the NFTB carriers that had authority to operate outside the Province of Ontario. Although this Committee did not have ICC authorization or approval to engage in rate-making, the appellants alleged that, through the Committee, appellees "engaged in the joint setting of rates and related policies and also agreed upon methods by which to inhibit competition for the transportation of freight by motor carrier between the United States and the province of Ontario, Canada;" set and controlled NFTB rate levels without complying with the notice, publication, public hearing or record keeping requirements of ICC regulations; planned "threats, coercion and retaliation" against NFTB member carriers for exercising the right of independent action and carried out such threats; and filed tariffs with the ICC in furtherance of the conspiracy. As a result of the conspiracy, appellants alleged, rates for the transportation of freight by motor carrier between the United States and Ontario were fixed at artificial and non-competitive levels, competition between and among the appellee motor carriers was restrained, competition generally in trade and commerce in the transportation of freight by motor service between the United States and Canada was suppressed, and purchasers of freight transport between the United States and Ontario were deprived of free and open competition. The injury suffered was alleged by Square D to be that shippers "have not been able to purchase transportation at rates determined by free and open competition and have been injured in their business and property in that they have paid more for motor freight transport between the United States and the Province of Ontario, Canada than they would have paid in a freely competitive market." Big D alleged substantially the same injury, although this was phrased in slightly different language. Appellants sought damages and injunctive relief.
 
 
 4
 Appellees moved, pursuant to F.R.Civ.P. 12(c) and 12(h)(2), for judgment on the pleadings as to appellants' claim for damages on the basis of Keogh v. Chicago & N.W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Appellants contended that Keogh had been overruled by the Reed-Bulwinkle Act, Pub.L. No. 80-662, 62 Stat. 472 (1948), (current version at 49 U.S.C. Sec. 10706), and also by the Supreme Court's decisions in Carnation Co. v. Pacific Westbound Conf., 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) and ICC v. American Trucking Ass'n, --- U.S. ----, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984). Disagreeing with this and going beyond the terms of the motion, Chief Judge Curtin did not limit his holding to the damages claims, and dismissed the complaints in their entirety. This appeal followed.
 
 The Keogh opinion
 
 5
 In Keogh, a shipper of excelsior and flax tow brought an action under the Sherman Act alleging that rail carriers had restrained competition by combining to fix rates. The challenged rates had been duly filed by the carriers with the ICC and had been attacked there by shippers. The ICC suspended the tariffs pending investigation, but approved the new rates after extensive hearings in which Keogh participated; the challenged rates had not been made effective until after they had been so approved. The Supreme Court held that while the Interstate Commerce Act ("ICA") does not immunize regulated carriers from antitrust liability in Government proceedings, a private shipper may not recover treble-damages because he lost the benefit of lower rates which he would have enjoyed but for the conspiracy. 260 U.S. at 161-62, 43 S.Ct. at 49. Rather than limiting its holding to cases where, as in Keogh, rates had been investigated and approved by the ICC, the Court said broadly that shippers could not recover treble-damages for overcharges whenever tariffs have been filed. Id. at 163, 43 S.Ct. at 49.
 
 
 6
 Justice Brandeis advanced four reasons for this result. The first, and most important, turns on the existence of a remedy in the ICA respecting rates. He began by stating that
 
 
 7
 [a] rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti-Trust Act. What rates are legal is determined by the Act to Regulate Commerce.
 
 
 8
 Id. at 162, 43 S.Ct. at 49. He pointed out that under Sec. 8 of the latter act, 49 U.S.C. Sec. 8 (current version at 49 U.S.C. Sec. 11705(b)), the exaction of any rate that is illegal under the ICA makes the carrier liable to the person injured thereby for the full amount of damages together with a reasonable attorney's fee, recoverable either by complaint before the ICC or in an action in a federal court; thus if the conspiracy complained of in Keogh had resulted in rates which the ICC "found to be illegal because unreasonably high, or discriminatory, the full amount of the damages sustained, whatever their nature, would have been recoverable in such proceedings." Id. Justice Brandeis then propounded a rhetorical question:
 
 
 9
 Can it be that Congress intended to provide the shipper, from whom illegal rates have been exacted, with an additional remedy under the Anti-Trust Act? And if no remedy under the Anti-Trust Law is given where the injury results from the fixing of rates which are illegal, because too high or discriminatory, may it be assumed that Congress intended to give such a remedy where, as here, the rates complained of have been found by the Commission to be legal and while in force had to be collected by the carrier?
 
 
 10
 Id. (citation omitted).
 
 
 11
 Justice Brandeis next developed a second, closely related argument. After reciting Sec. 7 of the Sherman Act, which gives a right of action to one who has been injured in his business or property," he declared that
 
 
 12
 [i]njury implies violation of a legal right. The legal rights of shipper as against carrier are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.
 
 
 13
 Id. at 163, 43 S.Ct. at 49. This "stringent rule" was thought necessary "because otherwise the paramount purpose of Congress--prevention of unjust discrimination--might be defeated": if a shipper were allowed to recover under Sec. 7 of the Sherman Act "for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors." Id. That each shipper might bring a similar action under Sec. 7 failed to answer this concern, since "[u]niform treatment would not result, even if all sued, unless the highly improbable happened, and the several juries and courts gave to each the same measure of relief." Id.
 
 
 14
 Third, Justice Brandeis thought "[t]hat the character of the issues involved raises another obstacle to the maintenance of the action." The antitrust plaintiff could not prevail simply by proving "that some carrier would, but for the illegal conspiracy, have maintained a rate lower than that published;" he also would have to prove "that the hypothetical lower rate would have conformed to the requirements of the Act to Regulate Commerce." Id. at 163-64, 43 S.Ct. at 49-50. This was a question that must be determined by the ICC, at least in the first instance. Justice Brandeis dismissed the suggestion that this difficulty could be met by a court's suspending its proceeding pending reference to the ICC, saying that "by no conceivable proceeding could the question whether a hypothetical lower rate would under conceivable conditions have been discriminatory, be submitted to the Commission for determination." Id. at 164, 43 S.Ct. at 50.
 
 
 15
 Fourth and finally, Justice Brandeis found the plaintiff's damages to be purely speculative since all shippers of excelsior and tow were charged the same rates; hence, "[t]he benefit [of lower rates] might have gone to his customers, or conceivably, to the ultimate consumer." Id. at 164-65, 43 S.Ct. at 50.
 
 
 16
 Evaluation of the Keogh opinion in the light of subsequent
 
 
 17
 developments
 
 
 18
 Although the Keogh opinion has the "relentless quality" characteristic of Justice Brandeis,[2] many of his arguments do not seem so compelling today as they did in 1922. Passing the first argument for the moment and turning to the second, the fear that recovery of antitrust damages would operate "like a rebate" to produce discrimination among shippers ignores the difference between a carrier's passing money under the table to a favored shipper and a court's deciding that a shipper had suffered antitrust injury. See Note, Antitrust and Regulated Industries: A Critique and Proposal for Reform of the Implied Immunity Doctrine, 57 Tex.L.Rev. 751, 760 n. 26 (1979). Such a distinction was recognized by the Court in the context of the Shipping Act in Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), where the Court held:
 
 
 19
 We believe that Congress was concerned with assuring equality of treatment by the [carriers], not with equality of treatment by juries in collateral proceedings. There is no reason to believe that Congress would want to deprive all shippers of their right to treble damages merely to assure that some shippers do not obtain more generous awards than others.
 
 
 20
 Id. at 219 n. 3, 86 S.Ct. at 785. The argument that antitrust damages create discrimination contrary to the goals of the ICA is also inconsistent with the Court's recent holding in I.C.C. v. American Trucking Ass'n, --- U.S. ----, 104 S.Ct. 2458, 2462, 81 L.Ed.2d 282 (1984) ("ATA ") that
 
 
 21
 [w]henever the Commission finds an effective tariff unlawful, injured parties can recover both damages under Sec. 11705(b)(3) and whatever additional amounts the antitrust laws allow.
 
 
 22
 Id. at 2462. Furthermore, the argument is scarcely applicable to class actions like these, a means of avoiding Justice Brandeis' concerns that was unavailable in actions at law in 1922. See In re Wheat Rail Freight Rate Antitrust Litig., 579 F.Supp. 517, 535 (N.D.Ill.1984); F.R.Civ.P. 23, Notes of Advisory Committee; Wright, Federal Courts Sec. 72 at 470-72 (4th ed. 1983).
 
 
 23
 Justice Brandeis' third reason, that an antitrust action would require the carrier to prove that a hypothetical lower rate conformed to the requirements of the ICA, seems even less compelling. The process in which the ICC would have to engage if a court requested it to determine whether lower rates produced by competition would be reasonable and non-discriminatory does not differ in essence from that which it must undertake in a reparations case, since damages under Sec. 11705(b)(3) of the ICA are limited to the extent to which a tariff was unreasonable or discriminatory, see ATA, supra, 104 S.Ct. at 2463 n. 5 (citing Boren-Stewart Co. v. Atchison, T. & S.F. Ry., 196 I.C.C. 120, 125-26 (1933); Spencer Plant Foods, Inc. v. Atlantic C.L.R.R., 302 I.C.C. 799, 800 (1958)) To the extent Justice Brandeis was concerned about the unprecedented nature of a proceeding in which the ICC answered only the question whether a particular lower rate would have been reasonable and non-discriminatory without issuing a final order of its own, a concern consistent with his aversion to advisory opinions and declaratory judgments, see, e.g., Willing v. Chicago Auditorium Ass'n, 277 U.S. 274, 288-90, 48 S.Ct. 507, 508-509, 72 L.Ed. 880 (1928), this concern has been overcome in the many later cases in which the Supreme Court has directed the suspension of judicial proceedings pending the referral of similar issues to the ICC. See, e.g., United States v. Western Pac. R.R. 352 U.S. 59, 62-70, 77 S.Ct. 161, 164-168, 1 L.Ed.2d 126 (1956) (construction and reasonableness of tariff referred to ICC in Tucker Act claim); Southwestern Sugar & Molasses Co. v. River Terminal Corp., 360 U.S. 411, 420-22, 79 S.Ct. 1210, 1216-17, 3 L.Ed.2d 1334 (1959) (validity of contract clause referred to ICC in libel action); Pennsylvania R.R. v. United States, 363 U.S. 202, 203-06, 80 S.Ct. 1131, 1132-33, 4 L.Ed.2d 1165 (1960) (construction and reasonableness of tariff referred to ICC in action under ICA); see also United States v. Associated Transp., Inc., 505 F.2d 366, 369 (D.C.Cir.1974) (in exercising its exclusive jurisdiction to award reparations under 49 U.S.C. Sec. 304a(5), court must allow ICC to determine what would have been the "just and reasonable" rate); cf. Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 496-99, 78 S.Ct. 851, 860-62, 2 L.Ed.2d 926 (1958) (legality of dual-rate system referred to Federal Maritime Board to pass on initially). See generally 4 Davis, Administrative Law Treatise, ch. 22 (2d ed. 1984).
 
 
 24
 Justice Brandeis' fourth reason, that "no court or jury could say that, if the rate had been lower, [the shipper] would have enjoyed the difference" since the benefit "might have gone to his customers," 260 U.S. at 165, 43 S.Ct. at 50, is still less persuasive in view of later developments. Justice Brandeis himself was to hold in a suit alleging that unreasonably high rates were charged under the ICA that the possibility that a plaintiff had recouped overcharges from his customers was irrelevant in assessing damages. Adams v. Mills, 286 U.S. 397, 406-08, 52 S.Ct. 589, 591-92, 76 L.Ed. 1184 (1932); see also Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533-34, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (Holmes, J.). The Supreme Court has also rejected the argument that a plaintiff cannot recover damages it was able to pass on to its customers in the antitrust context. Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 487-94, 88 S.Ct. 2224, 2228-32, 20 L.Ed.2d 1231 (1968); Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972); Illinois Brick Co. v. Illinois, 431 U.S. 720, 723-26, 97 S.Ct. 2061, 2063-64, 52 L.Ed.2d 707 (1977). Indeed, in Hanover Shoe, the defendant relied on Keogh for its argument that plaintiff could not recover any damages; the Court labeled the damages argument made in Keogh "dictum" since, in the Court's view, the shipper there was held to have no cause of action under the antitrust laws "[b]ecause the rates had been approved as reasonable after a proceeding before the Interstate Commerce Commission...." 392 U.S. at 491 n. 8, 88 S.Ct. at 2230 n. 8. The Court then went on to say, "[w]e ascribe no general significance to the Keogh dictum for cases where the plaintiff is free to prove that he has been charged an illegally high price." Id.
 
 
 25
 Even the first reason expressed for the result in Keogh no longer seems so self-evident as Justice Brandeis thought. Why is a rate "not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti-Trust Act?" Justice Brandeis had recognized in the preceding paragraph of his opinion that a combination of carriers "to fix reasonable and non-discriminatory rates may be illegal." 260 U.S. at 161-162, 43 S.Ct. at 49 (citing United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); United States v. Joint-Traffic Ass'n, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898)). Moreover, it has long been recognized that "[a] zone of reasonableness exists between maxima and minima within which a carrier is ordinarily free to adjust its charges for itself." United States v. Chicago, M., St. P. & P. R.R. 294 U.S. 499, 506, 55 S.Ct. 462, 465, 79 L.Ed. 1023 (1935). Why then should the shipper's ability to recover the excess of an unreasonable over a reasonable rate under the ICA preclude him from recovering the excess of a reasonable (and a fortiori an unreasonable) rate over the lower but still reasonable rate that would have prevailed under free competition? Since Keogh, the Supreme Court has held that implied exemptions to antitrust liability are "strongly disfavored." United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 350-51, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963). The Court has subsequently found that activity could be challenged under the antitrust laws despite the existence of an administrative agency with authority to regulate the activity. See, e.g., Silver v. New York Stock Exchange, 373 U.S. 341, 357-60, 83 S.Ct. 1246, 1257-58, 10 L.Ed.2d 389 (1963) (no exception found for rules subject to SEC disapproval promulgated by exchanges). Indeed, the Court has reached this result even where the agency is empowered to grant a remedy or agency approval has actually been obtained, and notwithstanding the fact that the agency considers effects on competition under the statutory scheme. See, e.g., United States v. Philadelphia Nat'l Bank, supra, 374 U.S. at 351-52, 83 S.Ct. at 1734-35 (approval of bank merger by Comptroller under Bank Merger Act does not impliedly exempt parties from antitrust laws); Otter Tail Power Co. v. United States, 410 U.S. 366, 373-75, 93 S.Ct. 1022, 1027-28, 35 L.Ed.2d 359 (1973) (available remedy before Federal Power Commission for refusal to sell power does not preclude remedy under antitrust laws).[3] In other words, it seems quite possible to answer the first of Justice Brandeis' rhetorical questions and perhaps--although that issue is not presented here--even the second, with a "Yes" rather than with the "No" he thought to be inexorably demanded.
 
 
 26
 The case for reaching a conclusion today contrary to that reached by Justice Brandeis is particularly strong in the light of recent statutes which rely increasingly on competition rather than regulation to insure the reasonableness of rail and motor carrier rates. See Otter Tail Power Co. v. United States, supra, 410 U.S. at 374, 93 S.Ct. at 1028 (emphasizing as a reason not to find an implied exemption to antitrust liability that the regulatory statute "indicates an overriding policy of maintaining competition to the maximum extent possible consistent with the public interest.") In the last decade, Congress has passed six major pieces of legislation "aimed at increasing competition and reducing unnecessary federal regulations" in the transportation industry. H.R.Rep. No. 1069, 96th Cong., 2d Sess. 3 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 2283, 2285 (accompanying Motor Carrier Act of 1980). These are the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, 90 Stat. 31 (1976); the Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705 (1978); the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895 (1980); the Household Goods Transportation Act of 1980, Pub.L. No. 96-454, 94 Stat. 2011 (1980); the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793 (1980); and the Bus Regulatory Reform Act of 1982, Pub.L. No. 97-261, 96 Stat. 1102 (1982). Exposing ratemaking to competitive forces to as great an extent as possible was among the most significant aspects of this deregulation. H.R.Rep. No. 1069, supra, at 3-4, 1980 U.S.Code Cong. & Ad.News at 2285-86 (Motor Carrier Act); H.R.Rep. No. 1035, 96th Cong., 2d Sess. 33-34, reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 3978-79 (Staggers Rail Act). For example, Sec. 11 of the Motor Carrier Act of 1980, the most directly relevant legislation here, added subsection (d) to 49 U.S.C. Sec. 10708. This bars the Commission from interfering with a rate proposed by individual carriers on the basis that it is too high or too low if the rate is within 10 percent of the rate one year prior to the effective date of the new rate. Paragraph (4) (redesignated 49 U.S.C. Sec. 10708(d)(6) by the Bus Regulatory Reform Act) provides that rates implemented pursuant to this subsection "shall be subject to the antitrust laws" except that they may be jointly docketed and published pursuant to carrier agreements approved under 49 U.S.C. Sec. 10706. The House Report accompanying the bill explains:
 
 
 27
 The thrust of this new subsection is to provide for more pricing freedom and less government regulation and to balance freer entry into the industry, freer expansion of the industry, and the additional competition that will result from other provisions of the bill. The concept, then, is to spur competition both in service and in pricing. Plainly, the intent is to give the carriers and the shipping public the ability to structure their transportation systems and needs around a variety of service and price options. Another anticipated impact is that, by separating the new pricing flexibility from collective ratemaking with its attendant antitrust immunity, the carriers will establish many of their rates independently of one another. This will create a more competitive motor carrier system.
 
 
 28
 H.R.Rep. No. 1069, supra, at 25, 1980 U.S.Code Cong. & Ad.News at 2307.[4] In a case involving anticompetitive activities after October 1, 1980, the effective date of the Motor Carrier Act of 1980, the change effected by that statute would have to be taken into account. However, appellants have not asked us to treat their claims arising after October 1, 1980 differently from those arising before that date; they have argued rather that passage of the Motor Carrier Act of 1980 "again confirmed" the fact that the Keogh doctrine had already been overruled.
 
 
 29
 Has Keogh been overruled by statute or Supreme Court decision?
 
 
 30
 Appellants acknowledge, as they must, that the Supreme Court has not expressly overruled Keogh; indeed, Keogh was reaffirmed and applied to damages claims concerning rates that had been filed with but had not been approved (or disapproved) by the ICC in Georgia v. Pennsylvania R.R., 324 U.S. 439, 453, 65 S.Ct. 716, 724, 89 L.Ed. 1051 (1945). Little over a year ago it was applied in Minsky v. Auto Driveway Company, 734 F.2d 18 (7 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 435, 83 L.Ed.2d 361 (1984). It has frequently been cited by the Supreme Court with apparent approval. See United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 485, 52 S.Ct. 247, 250, 76 L.Ed. 408 (1932) (courts will leave matters for which express agency remedy under Shipping Act exists to the agency); Far East Conf. v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952) (quoting Cunard and applying it to a Government suit); United States v. RCA, 358 U.S. 334, 347-48, 79 S.Ct. 457, 465, 3 L.Ed.2d 354 (1959) (under pervasive regulatory scheme courts must defer to agency's primary jurisdiction); Pan American World Airways, Inc. v. United States, 371 U.S. 296, 310, 83 S.Ct. 476, 485, 9 L.Ed.2d 325 (1963) (Aviation Act leaves to CAB all questions of injunctive relief respecting route allocation); United States v. Philadelphia Nat'l Bank, supra, 374 U.S. at 351 & n. 29, 83 S.Ct. at 1734 n. 29 (implied repeal of antitrust laws in cases of "plain repugnancy between antitrust laws and regulatory provisions"); Hawaii v. Standard Oil Co., 405 U.S. 251, 260, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972) (citing Keogh to explain holding in Georgia v. Pennsylvania R.R.); Ricci v. Chicago Mercantile Exch., 409 U.S. 289, 290, 299-300 & n. 12, 93 S.Ct. 573, 574, 579 & n. 12, 34 L.Ed.2d 525 (1973) (citing Keogh as an example of the "recurring problem" of conduct seemingly within the reach of both antitrust laws and other regulatory statutes); McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980) (court may have jurisdiction over antitrust action even though remedies are limited to injunctive relief). But see Hanover Shoe, Inc. v. United Shoe Mach. Corp., supra, 392 U.S. at 491 n. 8, 88 S.Ct. at 2230 n. 8 (shipper in Keogh had no cause of action "[b]ecause the rates had been approved as reasonable after a proceeding before the Interstate Commerce Commission").[5] No decision of this or any other circuit has treated Keogh as having been overruled with respect to rates for transportation or other services that have been filed with an appropriate federal agency as required by law except when, as in Essential Communications Sys. Inc. v. American Tel. & Tel. Co., 610 F.2d 1114, 1121-24 (3 Cir.1979); City of Groton v. Connecticut Light & Power Co., 662 F.2d 921, 929 (2 Cir.1981), and Litton Sys., Inc. v. American Tel. & Tel. Co., 700 F.2d 785, 820 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984), the agency has itself raised questions regarding the lawfulness of the rates. All these cases, moreover, were suits by competitors rather than users of the service, so that many of the considerations relied upon in Keogh would not apply. See Essential Communications, supra, 610 F.2d at 1122. Nevertheless, appellants have presented arguments challenging the current status of Keogh that, although they must ultimately be rejected, warrant detailed consideration.
 
 
 31
 Appellants' contention that Keogh has been overruled by statute rests principally on the Reed-Bulwinkle Act, Pub.L. No. 80-662, 62 Stat. 472 (1948) (current version at 49 U.S.C. Sec. 10706), which authorized the formation of joint associations of carriers upon approval by the ICC and granted full immunity from the antitrust laws (as contrasted with the freedom from private suits by shippers for treble-damages recognized in Keogh ) with respect to making or carrying out approved agreements. This argument appears neither to have been advanced nor considered in cases citing Keogh with approval decided since 1948. The legislative history of the Reed-Bulwinkle Act, however, refutes the contention that Congress intended to overrule the Keogh doctrine in enacting that legislation.
 
 
 32
 The practice of forming organizations of carriers to facilitate joint action by participating members long antedated the Reed-Bulwinkle Act. Keogh itself dealt with such an organization. See 260 U.S. at 159-60, 43 S.Ct. at 48. These organizations offered a practical means of dealing with the many matters, among the most important of which was ratemaking, as to which coordinated action was felt necessary. See H.R.Rep. No. 1100, 80th Cong., 2d Sess. (1947), reprinted in 1948 U.S.Code Cong. & Ad.News 1844, 1849-54 (accompanying Reed-Bulwinkle Act). In its 1898 Annual Report, the ICC concluded that "to one familiar with actual conditions it seems practically out of the question to establish rates that are relatively just without conference and agreement." 12 ICC Ann.Rep. 15-16 (1898). Similarly, the House Report accompanying the Reed-Bulwinkle Act, which repeats the Senate Report and incorporates additional material, concluded:
 
 
 33
 It is recognized by all who are familiar with the problems of transportation that the carriers subject to the Interstate Commerce Act cannot satisfactorily meet their duties and responsibilities thereunder, and the basic purposes of that act cannot be effectively carried out, unless such carriers are permitted to engage in joint activities to a substantial extent.
 
 
 34
 H.R.Rep. No. 1100, supra, 1948 U.S.Code Cong. & Ad.News at 1847.
 
 
 35
 Nonetheless, legislation according express antitrust immunity to joint activity by land carriers was slow in coming. Transportation Act, 1920, Pub.L. No. 66-152, 41 Stat. 456, 480, 482, provided immunity from the antitrust laws for approved agreements respecting certain kinds of transactions, such as poolings, divisions, consolidations, mergers, acquisitions and the like, but failed to immunize many of the most important activities requiring joint agreements, such as ratemaking and establishing through routes and joint rates.[6] Congress failed to immunize these activities earlier because for many years legislation was not deemed necessary. As the House Report on the Reed-Bulwinkle Act explains, joint carrier organizations had been operating openly with the full knowledge of the ICC, state regulatory bodies, shippers and others involved in the transportation industry. H.R.Rep. No. 1100, supra, 1948 U.S.Code Cong. & Ad.News at 1846. In many instances, joint ratemaking associations were "maintained with the approval and cooperation of the shippers ... and [were] encouraged by the Commission and various other agencies and departments of the Government as both necessary and desirable. In fact, various departments and agencies of the Government ... frequently utilized them to advantage." Id. Commissioner Clyde Aitchison of the ICC testified that during the early decades of the century both the Department of Justice and the courts understood that joint ratemaking by common carriers was necessary to the operation of the transportation system and did not challenge this activity under the antitrust laws as long as carriers preserved their right of independent action. See Hearings on H.R. 2536 Before the Senate Comm. on Interstate Commerce, 79th Cong., 2d Sess. 1133-48 (1946) [hereinafter cited as 1946 Senate Hearings]. However, in the early 1940's, the Department of Justice began to question the legality of the cooperative activities of the carriers. Officials of the Department pointed out that there was a range of "reasonable" rates under the ICA and maintained that joint ratemaking needlessly kept rates at the upper end of this range in contravention of the policies underlying the antitrust laws. See 1946 Senate Hearings, supra, at 556-90 (testimony of Arne Wiprud, former Chief of Transportation Section, Antitrust Division, Department of Justice), 744-67 (testimony of Wendell Berge, Assistant Attorney General); Hearings on S. 110 Before the Senate Comm. on Interstate and Foreign Commerce, 80th Cong., 1st Sess. 65-81 (1947) (testimony of Wendell Berge) [hereinafter cited as 1947 Senate Hearings]; Hearings on H.R. 221 and S. 110 Before the House Comm. on Interstate and Foreign Commerce, 80th Cong., 1st Sess. 174-75 (1947) (testimony of Albert Boggess, Special Assistant to the Attorney General) [hereinafter cited as 1947 House Hearings]. This policy shift manifested itself in the form of a series of suits brought by the Department of Justice against carrier organizations:
 
 
 36
 Efforts at Chicago in 1942 to indict certain railroads, motor carriers, and others under the antitrust laws for participating in those activities were stopped because it was believed that such prosecution would seriously interfere with the war effort. Early in 1943 an indictment under the antitrust laws of certain motor carriers and motor carrier rate associations was returned at Denver and, after trial, all of the defendants were acquitted by the verdict of a Federal court jury. In 1943 a certificate was issued by the Chairman of the War Production Board declaring rate bureaus and similar carrier organizations to be requisite to the prosecution of the war. In 1944 an injunction suit under the antitrust laws was brought by the Department of Justice in the United States District Court for the District of Nebraska against the western railroads and the Association of American Railroads and others to enjoin them from carrying on various cooperative activities....
 
 
 37
 H.R.Rep. No. 1100, supra, 1948 U.S.Code Cong. & Ad.News at 1846. In addition, in 1944 the State of Georgia filed a suit in the Supreme Court as parens patriae alleging rate-fixing by eastern and southern railroads. This suit led to the opinion in Georgia v. Pennsylvania R.R., supra, where the Court dismissed the damages claims on the authority of Keogh but went on to hold that the State could maintain a suit to enjoin the alleged rate-fixing conspiracy since "that is a matter over which the Commission has no jurisdiction." 324 U.S. at 455, 65 S.Ct. at 725. The suit was still pending on its merits during the deliberations over the Reed-Bulwinkle Act.
 
 
 38
 These suits, together with the expiration of the War Production Board's certificate of exemption in 1946, provided the immediate impetus for the enactment of the Reed-Bulwinkle Act. See H.R.Rep. No. 1100, supra, 1948 U.S.Code Cong. & Ad.News at 1847; cf. 1947 Senate Hearings, supra, at 6 (testimony of J. Monroe Johnson, Director, Office of Defense Transportation). Congress was concerned with the effect of such antitrust actions on transportation policy: a recurring theme in the testimony at the hearings was that antitrust suits might conflict with the national transportation policy manifested in the ICA. See, e.g., 1946 Senate Hearings, supra, at 365-70 (testimony of Sam B. Winn, Chairman, Western Conference Commission), 1171-72 (testimony of Clyde Aitchison, Commissioner, ICC); 1947 House Hearings, supra, at 9-11 (statement of Frederick Hamley, General Solicitor, NARUC). Congress recognized that it could not by legislation deal with each instance of joint action by carriers to resolve whatever conflict may exist between the principles of the antitrust laws and the national transportation policy. H.R.Rep. No. 1100, supra, 1948 U.S.Code Cong. & Ad.News at 1848. Rather, in the words of the House Committee:
 
 
 39
 The only practical approach to the problem is to grant to a competent administrative agency, as is proposed in the bill, the authority to resolve the conflict in specific instances of proposed joint action by carriers.
 
 
 40
 Since this problem arises in the relatively circumscribed field of transportation, the agency which is peculiarly well qualified to exercise this authority is the Interstate Commerce Commission. The bill here reported, therefore, places this responsibility upon that Commission.
 
 
 41
 The bill leaves the antitrust laws to apply with full force and effect to carriers, so far as they are now applicable, except as to such joint agreements or arrangements between them as may have been submitted to the Interstate Commerce Commission and approved by that body upon a finding that, by reason of furtherance of the national transportation policy as declared in the Interstate Commerce Act, relief from the antitrust laws should be granted.
 
 
 42
 Id. (emphasis added).
 
 
 43
 Appellants argue that the Reed-Bulwinkle Act was intended to be a comprehensive regulation of rate-making agreements: If the carriers acted within the terms of an approved agreement their conduct would be immunized from all antitrust liability, including the proceedings for redress by injunction and criminal prosecution left open by Keogh as interpreted in the Georgia case; on the other hand, if they acted pursuant to an unapproved agreement or without complying with the terms of an approved agreement, they were to be subject to damages liability, Keogh notwithstanding. There would be some force in this contention if the Committee Report had said merely "[t]he bill leaves the antitrust laws to apply with full force and effect to carriers ... except," etc. However, the Committee was at pains to insert the qualifying phrase "so far as they are now applicable." Keogh had ruled that the antitrust laws were not applicable so as to allow shippers to maintain suits for damages resulting from filed tariffs. Beyond this, the legislative history contains no suggestion of any intention to overrule Keogh, and it is somewhat difficult to suppose that an act for relief of railroads silently operated against them in so material a respect.
 
 
 44
 This silence in the legislative history is particularly significant in that the Congress that enacted the Reed-Bulwinkle Act was undoubtedly familiar with the Keogh doctrine. Keogh had been expressly reaffirmed and applied in the Georgia case, which received extensive and detailed consideration in the hearings: more than a dozen witnesses testified about the case, and the opinion of the Supreme Court was made a part of the Committee record; indeed, Arne Wiprud, formerly of the Antitrust Division of the Department of Justice, read to the Committee the passage from the Supreme Court's opinion reaffirming the limitation on shippers' rights to recover treble-damages. 1946 Senate Hearings, supra, at 581. Several other witnesses discussed the Keogh decision itself. Wendell Berge, then the Assistant Attorney General in charge of the Antitrust Division, read passages from the opinion to the Committee, including the passage recognizing an exception for antitrust liability in Government proceedings. 1946 Senate Hearings, supra, at 799; see also 1947 Senate Hearings, supra, at 73. Commissioner Aitchison, the importance of whose testimony is underscored by its having been quoted at length in the Committee Reports, ended his explanation of the history of rate regulation and the antitrust laws with a discussion of the Keogh and Georgia cases. He explained to the Committee that "the net result of the Keogh decision," which was "to limit the force of section 7 of the Sherman Act, as related to wrongs for which there was a money-damage remedy afforded under the Interstate Commerce Act," did not go far enough because it left open the possibility of proceedings by the Government. 1946 Hearings, supra, at 1148-49. He urged the Congress to extend antitrust immunity to Government and private injunction actions challenging agreements that had been approved by the ICC. No one suggested, however, that Keogh should be overruled, and there is no basis under the circumstances to infer that Congress intended to do so by implication, particularly since neither the purposes nor the operation of the Keogh doctrine and the Reed-Bulwinkle Act conflict.
 
 
 45
 The immunity established in 1948 in the Reed-Bulwinkle Act remained, with modifications not relevant here, until 1980. In that year, Congress passed the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793 (the "1980 Act"). Section 14, 49 U.S.C. Sec. 10706, revised the requirements for a carrier to obtain immunity from antitrust liability and limited the scope of the available immunity. Appellants do not argue that this legislation overruled Keogh, but assert only that "[p]assage of the Motor Carrier Act of 1980 ... again confirmed that antitrust immunity is conditioned upon compliance with a Congressionally approved regulatory plan." As discussed above, the Reed-Bulwinkle Act had no such effect with respect to the Keogh doctrine; a brief review of the legislative history confirms that this conclusion applies as well to the 1980 Act.[7]
 
 
 46
 The immunity from the antitrust laws granted in the Reed-Bulwinkle Act was among the chief concerns in the debates over the 1980 Act. According to the House Report, "[n]o issue has received more attention during the debate before the Committee than whether this immunity should be allowed to continue. The debate centered on whether there continues to be a reasonable public quo in return for the collective ratemaking quid of the Reed-Bulwinkle Act." H.R.Rep. No. 1069, supra, at 27, 1980 U.S.Code Cong. & Ad.News at 2309. After extensive hearings conducted over a two-year period, the Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee proposed eliminating antitrust immunity for all collective ratemaking, although it recommended retaining immunity for joint tariff publication and interline arrangements. Committee on the Judiciary, 96th Cong., 2d Sess., Federal Restraints on Competition in the Trucking Industry: Antitrust Immunity and Economic Regulation 151 (Comm.Print 1980); see also id. at 45-69, 145-51. The ICC, on the other hand, urged more modest revisions, in particular the withdrawal of immunity for joint agreements respecting individual carriers' single-line rates. See Motor Carrier Act of 1980: Hearings on S. 2245 Before the Senate Comm. on Commerce, Science and Transportation, 96th Cong., 2d Sess. 1509, 1865-68 (statement of Darius Goskins, Chairman, ICC). Representatives of other organizations made various recommendations for retaining the Reed-Bulwinkle Act, revising it in minor ways or substantially altering it. See id. passim. The predominant opinion was critical of the existing rate bureau process and recommended that the immunity it enjoyed from the antitrust laws be curtailed substantially; Congress acquiesced in this. S.Rep. No. 641, 96th Cong., 2d Sess. 13-15 (1980). As finally passed, the 1980 Act significantly revised the antitrust immunity provided in the Reed-Bulwinkle Act. See H.R.Rep. No. 1069, supra, at 29-30, 1980 U.S.Code Cong. & Ad.News at 2311-12 (summarizing scope of permissible collective ratemaking). However, no mention appears to have been made of Keogh, and apart from the particular changes made by Sec. 10706 Congress did not expand antitrust liability beyond that which existed under the Reed-Bulwinkle Act.
 
 
 47
 Appellants' strongest argument that the Supreme Court has overruled Keogh, albeit sub silentio, is based on Carnation Co. v. Pacific Westbound Conf., 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966). Carnation, a shipper in foreign commerce, alleged that the Pacific Westbound Conference, an association of carriers by water approved under the Shipping Act by the Federal Maritime Commission ("FMC"),[8] increased the rate for shipping evaporated milk pursuant to an agreement with the Far East Conference, another approved association. The rates had been filed with the FMC as required by 46 U.S.C. Sec. 817(a); however, at the time the events alleged occurred, the Shipping Act also provided:
 
 
 48
 Every common carrier by water ... shall file immediately with the Federal Maritime [Commission] a true copy ... of every agreement, with another such carrier ... fixing or regulating transportation rates or fares....
 
 
 49
 ....
 
 
 50
 All agreements, modifications, or cancellations made after the organization of the [Commission] shall be lawful only when and as long as approved by the [Commission], and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.
 
 
 51
 Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of [the antitrust laws]....
 
 
 52
 46 U.S.C. Sec. 814 (1958). Carnation alleged that Pacific Westbound and Far East agreed, without obtaining FMC approval, to surrender their right to take independent action and that Pacific Westbound maintained the increased rate only because Far East would not agree to its being lowered. This conduct, Carnation contended, forfeited the express immunity from antitrust liability provided in Sec. 814 and was unlawful per se under the antitrust laws.
 
 
 53
 The carriers argued that the Shipping Act repealed all antitrust regulation of ratemaking activities of the shipping industry and that the exclusive remedy for shippers aggrieved by carriers' rates was before the FMC. The carriers relied for this argument on United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 483-88, 52 S.Ct. 247, 250-51, 76 L.Ed. 408 (1932), where the Court affirmed the dismissal of an antitrust action to enjoin a dual-rate system because the FMC had primary jurisdiction, and Far East Conf. v. United States, 342 U.S. 570, 576-77, 72 S.Ct. 492, 495, 96 L.Ed. 576 (1952), where the Court applied Cunard to bar a similar challenge by the United States as shipper. Carnation argued that these cases were distinguishable on the ground that the plaintiffs there sought an injunction that would have interfered with the FMC's performance of its functions respecting the conduct challenged. The carriers responded that the doctrine that an administrative remedy supersedes antitrust remedies originated in a treble-damages action, citing Keogh, which, they pointed out, was relied on in Cunard and Far East.
 
 
 54
 The Supreme Court rejected the argument that the Shipping Act displaced the antitrust laws entirely and held that "the implementation of rate-making agreements which have not been approved by the Federal Maritime Commission is subject to the antitrust laws." 383 U.S. at 216, 86 S.Ct. at 783. The Court reasoned that Congress would not have created an expressly limited immunity such as the one found in Sec. 814 if it had intended to immunize the industry completely from antitrust liability. Id. at 216-20, 86 S.Ct. at 783-85. Cunard and Far East were distinguished on the ground that these cases "merely hold that courts must refrain from imposing antitrust sanctions for activities of debatable legality under the Shipping Act in order to avoid the possibility of conflict between the courts and the Commission." Id. at 220, 86 S.Ct. at 785. However, Cunard and Far East "permit courts to subject activities which are clearly unlawful under the Shipping Act to antitrust sanctions so long as the courts refrain from taking action which might interfere with the Commission's exercise of its lawful powers." Id. at 221, 86 S.Ct. at 786. An award of treble-damages for past and completed conduct which clearly violated the Shipping Act would not interfere with the authority of the FMC, id. at 222, 86 S.Ct. at 787, although to avoid conflict with the agency, the question whether the conduct challenged clearly violated the Shipping Act (in Carnation this depended upon whether the rates were filed pursuant to approved or unapproved agreements) did require preliminary resort to the FMC, id. at 222-23, 86 S.Ct. at 787. Accordingly, the Court directed that the action be stayed pending the conclusion of proceedings before the agency, with instructions to allow the suit to proceed if the FMC found that the agreements were not approved. Id. at 223-24, 86 S.Ct. at 787.
 
 
 55
 The Court did not refer to Keogh in its opinion. Since, as appellants argue here, the result in Carnation appears on its face to conflict with the holding in Keogh that filed tariffs define the legal rights between shipper and carrier "unless and until disapproved" by the agency, they deem this omission to imply that the Court intended to overrule Keogh but for some reason was unwilling to say so. We think it more plausible that, if the Court intended to overrule Keogh or even seriously to question that decision, it would have discussed or at least mentioned the fact. Moreover, a sound basis existed for distinguishing Keogh and finding, as the Court apparently did, that the filing of tariffs under the Shipping Act does not limit the rights of shipper vis-a-vis carrier.
 
 
 56
 As has been pointed out above, in the years after Keogh was decided, implied exemptions to the antitrust laws fell into strong disfavor. By the time Carnation was decided in 1966, the necessity of implying a repeal of the antitrust laws was measured by the pervasiveness of the regulation of the industry in question and the authority of the regulatory agency to perform the antitrust function of regulating competition with respect to the challenged practice. See Hale & Hale, Mergers in Regulated Industries, 59 Nw.U.L.Rev. 49, 54-56 (1964); Note, The Antitrust Immunity Doctrine and United States v. National Association of Securities Dealers: Stepping on Otter Tail, 28 Hastings L.J. 387, 388-89 396-411 (1976); e.g., United States v. RCA, 358 U.S. 334, 346-52, 79 S.Ct. 457, 464-468, 3 L.Ed.2d 354 (1959) (no repeal for broadcasters under Communications Act of 1934); Silver v. New York Stock Exchange, supra, 373 U.S. at 347, 357-65, 83 S.Ct. at 1257-61; Philadelphia Nat'l Bank, supra, 374 U.S. at 348-52, 83 S.Ct. at 1733-35. Compared to the ICA, the Shipping Act is a very limited regulatory scheme. It imposes only a few general duties, and the central purpose of the statute was to provide for industry self-regulation through agreements between carriers under the aegis of the FMC, which was to approve or disapprove these agreements with an eye to the prevention of certain practices deemed unjustly or unfairly discriminatory. 46 U.S.C. Secs. 811-816; see Federal Maritime Bd. v. Isbrandtsen Co., 356 U.S. 481, 487-91, 78 S.Ct. 851, 856-58, 2 L.Ed.2d 926 (1958); Federal Maritime Comm'n v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 241-43, 88 S.Ct. 1005, 1007-08, 19 L.Ed.2d 1071 (1968); Report of the Antitrust Division, Department of Justice, The Regulated Ocean Shipping Industry 34-35 (1977) [hereinafter cited as DOJ Report]; Note, Antitrust and the Shipping Industry: Interpretation of the Shipping Act of 1916, 12 N.Y.U.J.Int.L. & Pol. 115, 116-20 (1980). The ICA and the Shipping Act differ significantly with respect to the relative powers of the ICC and the FMC concerning rate regulation. As the Senate Report accompanying the 1961 amendments to the Shipping Act noted, "[w]hereas Congress has vested rate control powers and responsibilities in Government regulatory agencies concerned with domestic surface and air transportation, it has heretofore given to the maritime regulatory agencies no similar mandate over international shipping rates." S.Rep. No. 860, 87th Cong., 1st Sess. 5 (1961), reprinted in 1961 U.S.Code Cong. & Ad.News 3108, 3112; see also Federal Maritime Bd. v. Isbrandtsen Co., supra, 356 U.S. at 490-91, 78 S.Ct. at 857-58; 1947 Senate Hearings, supra, at 593-94 (statement of Arne Wiprud) (arguing that the Shipping Act is not a valid precedent for the Reed-Bulwinkle Act).[9] Although the FMC can and does take effects on competition into account in approving conference agreements under 46 U.S.C. Sec. 814, see Federal Maritime Comm'n v. Aktiebolaget Svenska Amerika Linien, supra, 390 U.S. at 243-46, 88 S.Ct. at 1008-10; Mediterranean Pools Investigation, 9 F.M.C. 264, 288-90 (1966), the Shipping Act does not give the Commission any mandate to regulate rate competition and, indeed, the statutory scheme was designed to minimize the role of the FMC in this regard. See DOJ Report, supra, at 61-62 & n. 143. The FMC has only "limited ratemaking authority" over foreign commerce, id. at 37, 47, and, consequently, its ability to award reparations is also circumscribed, cf. 46 U.S.C. Sec. 821(a). After a hearing it may disapprove a rate that it finds to be "so unreasonably high or low as to be detrimental to the commerce of the United States." 46 U.S.C. Sec. 817(b)(5). However, the Commission is without power to establish a new "reasonable" rate and can only require the conference or carrier to file a more acceptable one. The FMC's sole ratemaking power is the power to alter rates "to the extent necessary to correct ... unjust discrimination or prejudice" towards shippers or ports under 46 U.S.C. Sec. 816. Unlike the ICC, the FMC cannot establish through routes, joint classifications and joint rates, and cannot suspend a proposed tariff.[10] See Fair & Guandolo, Transportation Regulation 46-47, 200-209 (7th ed. 1972); DOJ Report, supra, at 36, 47. Thus, the pervasive authority of the ICC respecting the rates and business of carriers under its jurisdiction is absent from transportation subject to the more limited scrutiny of the FMC. See In re Ocean Shipping Antitrust Litig., 500 F.Supp. 1235, 1241 (S.D.N.Y.1980) (distinguishing Keogh because "[t]he FMC wields relatively weak power to supervise tariffs").[11]
 
 
 57
 Appellants' reliance on ATA, supra, 104 S.Ct. 2458, has even less force. The Court there was called upon to decide whether the ICC could declare effective tariffs that later investigation revealed to have been agreed upon in violation of section 14 of the 1980 Act, 49 U.S.C. Sec. 10706, retroactively ineffective. This would entitle shippers to rates as if the unlawful tariff had never existed and thus require the carriers to pay reparations equal to the excess of what the carriers actually collected over the rates in effect prior to those declared unlawful. Such a remedy would often expose carriers to damages liability greatly in excess of their potential liability in an action before the ICC under Sec. 11705(b)(3), which is limited to the extent to which an unlawful tariff was unreasonable or discriminatory and which thus gives the carrier the full benefit of the available range of lawful rates. The carriers argued that this new remedy was unnecessary because suits under Sec. 11705(b)(3) and antitrust damages created adequate disincentives to the filing of unlawful tariffs; the ICC disagreed, and the Court sided with the Commission. Keogh was not mentioned in the opinion and was only cited twice in the briefs for minor propositions.[12] The Court clearly assumed that shippers can recover treble-damages for filed tariffs that embody antitrust violations, but only after the ICC finds a tariff that was filed and became effective to be unlawful. See 104 S.Ct. at 2462 ("Where the Commission finds an effective tariff unlawful, injured parties can recover both damages under Sec. 11705(b)(3) and whatever additional amounts the antitrust laws allow"); see also id. at 2466-67 (opinion of the Court), 2471 (O'Connor, J., dissenting). Thus, appellants read too much into the opinion in asserting that this result overrules Keogh with respect to tariffs that have been approved or have not been disapproved, although ATA does render Keogh inapplicable where the ICC has expressly found a filed tariff to be unlawful. This is of no aid to appellants, however, since the tariffs challenged here were not declared unlawful by the ICC.
 
 
 58
 Injunctive Relief and Damages from Anticompetitive Acts
 
 Other than Agreements to Fix Rates
 
 59
 Although appellees had moved for judgment on the pleadings only with respect to appellants' claims for damages and not with respect to their claim for an injunction, a position well advised in light of Georgia v. Pennsylvania R.R., supra, 324 U.S. at 454-55, 65 S.Ct. at 724-25, Chief Judge Curtin dismissed the complaint in its entirety. He did not explain or even discuss why he dismissed sua sponte the claims for injunctive relief. The issue whether appellants could obtain an injunction had not been briefed. There is only a passing reference in a footnote in appellees' memorandum in support of the motion to dismiss to the effect that entry of the consent decree in the Government's action against NFTB would moot the injunction claims, and an equally brief response in a footnote in appellants' memorandum in opposition to this motion that the injunction claims "are not at issue" and thus "need not be dealt with." The injunction claims were neither raised nor discussed during the oral argument before the district court.
 
 
 60
 The district court has no authority to dismiss a complaint for failure to state a claim upon which relief can be granted without giving the plaintiff an opportunity to be heard. Lewis v. New York, 547 F.2d 4, 5-6 & n. 4 (2 Cir.1976) ("Failure to afford an opportunity to address the court's sua sponte motion to dismiss is, by itself, grounds for reversal"); Schlesinger Investment Partnership v. Fluor Corp., 671 F.2d 739, 742-43 (2 Cir.1982); see also Dodd v. Spokane County, 393 F.2d 330, 334 (9 Cir.1968); Literature, Inc. v. Quinn, 482 F.2d 372, 374 (1 Cir.1973). Appellees urge that we nonetheless affirm the lower court's dismissal of the injunction claims because remand "would be a futile gesture in light of the injunction already obtained by the Government" in United States v. Niagara Frontier Tariff Bureau, supra note 1, 1984-2 Trade Cas. at p 66,167. However, although the consent decree is far reaching, several of its provisions are limited in duration and applicability. See, e.g., id. at parts VI, XIII. Moreover, as appellants have the right to seek relief beyond that obtained by the Government, Madyun v. Thompson, 657 F.2d 868, 871-72 (7 Cir.1981), there may well remain additional matters as to which injunctive relief is appropriate. These issues cannot be determined on the sparse record before us. We must, therefore, remand to allow the plaintiffs an opportunity to show whether they are entitled to injunctive relief. To avoid waste of time and money, the district court may find it appropriate to address at the outset the issue of mootness raised by appellees on the basis of the Government consent decree.
 
 
 61
 In addition, appellants should be afforded an opportunity on remand to amend their complaint to state a claim for damages consistent with Keogh. That case applies only where the damages sought relate to filed tariffs, whether these result from a combination to file higher tariffs or from a combination to prevent others from taking independent action to file lower tariffs. See 260 U.S. at 161-63, 43 S.Ct. at 49; cf. City of Groton, supra, 497 F.Supp. at 1049-52 (dividing claims into those relating to filed tariffs and those relating to anticompetitive behavior "beyond the mere promulgation of rates" and applying Keogh only to the former); City of Groton, supra, 662 F.2d at 928-34 (reversing the district court but adopting the same analytical framework). A shipper may recover damages if it can show that carriers caused injury to the shipper's business or property other than by higher tariffs, such as by impeding its ability to transport its goods to other markets and thus decreasing its sales.
 
 
 62
 Appellants alleged that appellees conspired together and that:
 
 
 63
 [t]he aforesaid combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators, the substantial terms of which were to fix, raise and maintain prices and to inhibit or eliminate competition for the transportation of freight by motor carrier between the United States and the Province of Ontario, Canada without complying with the terms of the NFTB agreement and by otherwise engaging in conduct that either was not or could not be approved by the ICC.
 
 
 64
 Square D Complaint at p 22 (emphasis added); Big D Complaint at p 19. Appellants alleged further that appellees established a "Principals Committee" to further the conspiracy and that this committee "engaged in the joint setting of rates and related policies and also agreed upon methods by which to inhibit competition for the transportation of freight...." Square D Complaint at p 23(a) (emphasis added); Big D Complaint at p 20(a). At oral argument on the motion to dismiss, appellants' counsel explained to the court that these allegations charged appellees with having done more than simply file excessively high tariffs. In addition, counsel explained, appellees agreed "not to solicit or to try to attract certain types of traffic," and engaged in boycotts and other acts which interfered with the ability of non-conspiring carriers to provide transportation services in order to discourage these carriers from taking independent action and to coerce them into accepting the conspirators' anticompetitive strategy.
 
 
 65
 Chief Judge Curtin held that "[w]hatever the breadth of plaintiffs' allegations, the complaint essentially focuses on what plaintiffs claim are unjust and excessive rates." To be sure, the portions of appellants' complaints that state the nature of the injury suffered allege only injury caused from having to pay rates higher than those that would otherwise have prevailed. Square D Complaint at p 26; Big D Complaint at paragraphs 22, 23. However, the acts charged in the allegations quoted above could also support a claim that appellees injured appellants' business by impeding appellants' ability to market and sell their goods. As Professors Wright and Miller have indicated, "[a]mendment should be refused only if it appears to a certainty that plaintiff cannot state a claim." 5 Wright & Miller, supra, Sec. 1357 at 612-13 (citing cases); see also S.S. Silberblatt, Inc. v. East Harlem Pilot Block, 608 F.2d 28, 42 (2 Cir.1979) (leave to amend should be granted if plaintiff "has at least colorable grounds for relief"). Thus, on remand, appellants should be afforded an opportunity, if they believe the facts justify it, to amend their complaint to state a proper claim for damages. Such a claim would, of course, be subject to any appropriate motions by appellees.
 
 
 66
 Insofar as the judgment dismissed appellants' claims for damages in respect of filed rates, it is affirmed. Insofar as it dismissed the claim for an injunction, it is reversed and the cause is remanded for further hearing. On remand, appellants shall be given an opportunity to amend their complaints, if so advised, to state claims for damages other than damages arising from the filed tariffs. No costs.
 
 
 
 [1]
 Appellants' allegations are similar in many respects to those made in a civil antitrust action seeking injunctive relief later filed by the United States. A consent decree terminating that suit was entered on June 26, 1984. United States v. Niagara Frontier Tariff Bureau, Inc., 1984-2 Trade Cas. (CCH) p 66,167 (W.D.N.Y. June 26, 1984)
 
 
 [2]
 Friendly, Mr. Justice Brandeis: The Quest for Reason, 108 U.Pa.L.Rev. 985, 986 (1960), reprinted in Friendly, Benchmarks 291, 294 (1967). See also Professor Frankfurter's remark that Justice Brandeis' opinions "march step by step towards demonstration, with all the auxiliary reinforcement of detailed proof." Frankfurter, Mr. Justice Brandeis and the Constitution, 45 Harv.L.Rev. 33, 104 (1931)
 
 
 [3]
 The companion cases of Gordon v. New York Stock Exchange, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), and United States v. NASD, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), may be read to suggest a more stringent rule, namely, that merely entrusting an agency with authority over challenged activity requires exempting that activity from antitrust liability to avoid subjecting regulated entities to "duplicative and inconsistent standards." 422 U.S. at 735, 95 S.Ct. at 2450. However, there need be no "duplicative and inconsistent standards" in the context of rates for transport inasmuch as the ICC's conclusion that a rate is within the "zone of reasonableness" and the antitrust court's conclusion that the rates were unlawfully fixed at too high a price within this range do not conflict. Moreover, these decisions appear to require that the challenged practice have obtained some kind of stamp of approval from the agency through the agency's active exercise of--or deliberate choice not to exercise--its regulatory authority. See Gordon, 422 U.S. at 668-82, 689-91, 95 S.Ct. at 2604-11, 2614-15; NASD, 422 U.S. at 728, 730-35, 95 S.Ct. at 2448-50. Only a very small percentage of tariffs filed with the ICC are investigated because the sheer volume of filings makes investigation of the vast majority impossible. Cf. ATA, supra, 104 S.Ct. at 2463 n. 4 (the ICC reviews "only a random sampling of tariff filings, and tariffs with obvious defects are allowed to go into effect"); 97 ICC Ann.Rep. 71-73 (1983) (1.2 million filings, 188 examinations, 11 suspensions); 96 ICC Ann.Rep. 70-73 (1982) (over 900,000 filings, 366 examinations, 30 suspensions). Consequently, the investigation and approval or disapproval by the ICC of a small fraction of the tariffs filed would not seem to signify regulatory approval by the Commission of uninvestigated tariffs like those challenged here
 
 
 [4]
 Even more significant restrictions were imposed upon the authority of the ICC to regulate rate competition among rail carriers. Rail carriers may now establish any rate for transportation or other services unless the ICC determines that a carrier has "market dominance" respecting the transportation to which a particular rate applies. 49 U.S.C. Sec. 10701a. A difficult test must be met by a shipper wishing to show that a carrier has such dominance. See 49 U.S.C. Secs. 10707, 10709. Reese Taylor, Chairman of the ICC, explained to the Congress that the Staggers Rail Act "[b]asically ... eliminates rate regulation where there is effective competition." Statement of Reese H. Taylor, Jr., Chairman, ICC, Before the Subcomm. on Commerce, Transportation and Tourism of the House Committee on Energy and Commerce on Implementation of the Staggers Rail Act of 1980 at 16 (July 27, 1983). Indeed, one commentator has suggested that, under the Staggers Rail Act, Mr. Keogh no longer would have the remedy before the ICC that was so central to Justice Brandeis' opinion. F. Kahn, Keogh's Kaput, 49 I.C.C.Prac.J. 478, 483-84 (1982)
 
 
 [5]
 Appellants have not argued that footnote 8 in Hanover Shoe, Inc. v. United Shoe Mach. Corp., supra, limited Keogh to cases where the challenged rates had been approved. Indeed, Hanover Shoe is not referred to in any of the briefs. Seemingly the footnote was addressed only to Justice Brandeis' fourth reason. We hesitate to believe that this footnote reference was meant to overrule an opinion which had been and continues to be so widely cited and applied
 
 
 [6]
 The limited immunity granted to land carriers for approved transactions in Transportation Act, 1920, was amended, but not expanded, by the Transportation Act of 1940, Pub.L. No. 76-785, 54 Stat. 898, 905. By contrast, Congress provided a broad exemption from antitrust liability for water carriers whose agreements were approved by the United States Shipping Board (now the Federal Maritime Commission) under the Shipping Act of 1916, 46 U.S.C. Sec. 814, and for air carriers whose agreements were approved by the Civil Aeronautics Board under the Civil Aeronautics Act of 1938, 49 U.S.C. Sec. 492 (repealed and reenacted in 1958 as 49 U.S.C. Sec. 1382). These provisions were relied upon by Congress as precedents for the Reed-Bulwinkle Act. H.R.Rep. No. 1100, supra, 1948 U.S.Code Cong. & Ad.News at 1848-49
 
 
 [7]
 It is not entirely clear that the 1980 Act even applies to the facts of this case. The complaint alleges that the illegal conspiracy began "at least as early as 1966 and continue[d] at least until 1981." Although the 1980 Act became effective on October 1, 1980, the House Report acknowledges that:
 [m]ost likely, rate bureau agreements now in existence will not meet the new requirements of this section. Plainly, a transition period is needed during which these agreements remain in effect until the bureaus can comply with this section. This is the intent of the Committee.
 H.R.Rep. No. 1069, supra, at 30, 1980 U.S.Code Cong. & Ad.News at 2312. Since we conclude that the 1980 Act does not overrule Keogh, we need not address this question.
 
 
 [8]
 The United States Shipping Board was created in 1916 to enforce the Shipping Act. Its functions were transferred in succession to the United States Shipping Board Bureau in 1933, the United States Maritime Commission in 1936, the Federal Maritime Board in 1950, and, finally, the Federal Maritime Commission in 1961. We will refer throughout to the last of these, although some of the developments described in the text involved an agency with a different name
 
 
 [9]
 The Alexander Report, which led to the enactment of the Shipping Act and which was carefully considered by the Supreme Court in Carnation, see 383 U.S. at 218-19, 86 S.Ct. at 784-85, acknowledged that "the steamship business differs essentially from that of the railroads" as regards the desirability of rate regulation. H.R.Doc. No. 805, 63d Cong., 2d Sess. 420 (1914) [hereinafter cited as Alexander Report]; see also H.R.Rep. No. 659, 64th Cong., 1st Sess. 30 (1916) (accompanying the Shipping Act of 1916 and incorporating findings of the Alexander Report); S.Rep. No. 860, supra, at 25, 1961 U.S.Code Cong. & Ad.News at 3132 ("Your committee finds, however, that it would be a serious mistake at this time in world affairs for the U.S. Government unilaterally to assert by statute such a bold claim of right to sit in judgment of the 'reasonableness' of international freight rates.")
 
 
 [10]
 In 1979, the FMC was given the limited power to suspend tariffs, subject to disapproval by the President, in connection with an investigation into illegal rebating by a carrier. See Shipping Act Amendments of 1979, Pub.L. No. 96-25, Sec. 5, 93 Stat. 71, 72 (codified at 46 U.S.C. Sec. 821(c)(2), (4))
 
 
 [11]
 The limited authority of the FMC under the Shipping Act stands in contrast not only to the powers and duties of the ICC respecting land carriers, but also to the equally extensive authority conferred upon the ICC to regulate domestic shipping in the Transportation Act of 1940, Pub.L. No. 76-785, 54 Stat. 898, 929-952, which added title III to the Interstate Commerce Act and restricted the jurisdiction of the FMC over domestic waterborne commerce to the offshore trade between the United States and the territories. See H.R.Rep. No. 1217, 76th Cong., 1st Sess. 21-26 (1939); H.R.Conf.Rep. No. 2016, 76th Cong., 3d Sess. 76-78 (1940). See also Act of July 7, 1958, Pub.L. No. 85-508, Sec. 27(b), 72 Stat. 339, 351 (Alaska statehood bill preserving FMC jurisdiction over trade with Alaska); Act of March 18, 1959, Pub.L. No. 86-3, Sec. 18(a), 73 Stat. 4, 12 (Hawaii statehood bill preserving FMC jurisdiction over trade with Hawaii). In its brief, Carnation argued, persuasively it seems, that Keogh should be limited to the pervasive regulatory schemes enforced by the ICC and not applied to water carriage subject to the much less intrusive supervision of the FMC under the Shipping Act. See Petitioner's Brief at 43-48, Carnation, supra
 
 
 [12]
 Keogh was cited in a footnote in the brief of a group of railroads as amici curiae as additional authority for the proposition that "[e]ven for an admitted violation of the Act's substantive provisions, a shipper is not entitled to a refund 'without proof of actual damages.' " Brief of Aberdeen & R. R.R., et al. at 12 n. 20, ATA, supra. Keogh was also cited in the reply brief of the ICC in refutation of the argument that antitrust liability is an adequate deterrent; the ICC asserted: "But it is doubtful that many shippers can undertake an antitrust action given the costs and risks of such litigation. See Keogh v. Chicago & N.W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922)." Reply Brief of Petitioners at 5, ATA, supra